ELIZABETH BRUCE STRATTON, Plaintiff v. ROYAL BANK OF CANADA, Defendant

No. COA10-489

(Filed 19 April 2011)

**Declaratory Judgments— rightful owner of common stock— expiration of statute of limitations—laches**

The trial court did not err by granting defendant RBC's motion for summary judgment in a suit seeking declarative and compensatory relief claiming that plaintiff was the rightful owner of at least 14,486 shares of RBC common stock. The applicable statute of limitations and the doctrine of laches barred plaintiff's claims.

Appeal by Plaintiff from opinion and order entered 5 February 2010 by Judge John R. Jolly, Jr., in Wake County Superior Court. Heard in the Court of Appeals 3 November 2010.

*McDaniel & Anderson, L.L.P., by L. Bruce McDaniel, for Plaintiff-appellant.*

*Poyner Spruill, LLP, by John W. O'Hale and David Dreifus, for Defendant-appellee.*

HUNTER, JR., Robert, N., Judge.

Elizabeth Stratton is the sole heir to her mother's estate. Several years after her mother's death, she discovered a Bank of Manteo stock certificate, which had belonged to her mother, in a closet (the "Stock Certificate"). The Bank of Manteo is a predecessor corporation to RBC Centura Banks, Inc., which is owned by the Royal Bank of Canada ("RBC"). Years after discovering the Stock Certificate, Ms. Stratton brought suit seeking declarative and compensatory relief, claiming she is the rightful owner of at least 14,486 shares of RBC common stock. The trial court granted RBC's motion for summary judgment. We affirm because the trial court correctly concluded the applicable statute of limitations and the doctrine of laches bar Ms. Stratton's claims.

## I. Factual and Procedural Background

In 1927, Matilda Ethridge, who later changed her surname to "Inge" ("Ms. Inge"), purchased five shares of stock in the Bank of Manteo, represented by certificate number 86. She lived in Manteo,

North Carolina for most of her life. In 1933, Ms. Inge was listed as a shareholder on a Bank of Manteo document entitled "Stockholders Assent to Change." This is the most recent known documentary evidence of Ms. Inge owning RBC shares or shares of any of RBC's predecessors.

In 1962, the Bank of Manteo merged into Planters National Bank and Trust Company ("Planters Bank"). Two and eight-tenths shares of Planters Bank stock were issued for every one share of Bank of Manteo stock. According to a document filed with the United States Treasury Department, about two years before the merger occurred, Ms. Inge and approximately 600 other people lived in Manteo on a year-round basis; there were 800 "seasonal" residents. Ms. Stratton, who is Ms. Inge's daughter, was attending college at the time of the merger. She was banking with Bank of Manteo at the time and learned Planters Bank had subsumed the Bank of Manteo when she received a new checkbook bearing the Planters Bank name. According to a Bank of Manteo "stockholder list," the bank did not recognize Ms. Inge as a shareholder at the time it merged with Planters Bank.

Ms. Inge died in 1980. She was survived by Ms. Stratton, who served as the executrix of her estate. In 1982, Ms. Stratton discovered the original 1927 Stock Certificate in a closet. According to Ms. Stratton, Ms. Inge had been private with respect to her finances, and Ms. Stratton was unaware of Ms. Inge's financial transactions during her life. When serving as executrix, Ms. Stratton did not list in her estate accountings the Stock Certificate as property of the Inge estate.

In 1984 or 1985, Ms. Stratton asked a Planters Bank employee in Manteo to allow her to review a book of historical Bank of Manteo stock certificates. She was permitted to review the book, but did not inform the employee about the Stock Certificate. In 1985, Ms. Stratton asked a stockbroker to give her information about the stock. He told her "just to leave it alone," so she assumed the stock had value and continued to hold it. In 1985 or 1986, after an inquiry by Ms. Stratton's husband concerning what Ms. Stratton should do with the stock, a Manteo attorney told Ms. Stratton's husband he did not have time to handle the request for advice. Ms. Stratton was aware of this conversation. In 1986 or 1987, Ms. Stratton sought advice from a law firm in Elizabeth City. She paid the firm a retainer, but apparently chose not to pursue the matter any further at that time.

In 1990, the Planters Corporation merged with Peoples Bancorporation to form Centura Banks, Inc. Shareholders received

new stock in Centura on the basis of a one-for-one exchange. In 2001, RBC indirectly acquired Centura Banks, Inc. with 1.684 shares of RBC stock issued for each share of Centura Banks, Inc. stock. RBC Centura Banks, Inc. is now a wholly-owned subsidiary of RBC.

In 2003, Ms. Stratton asked her stepson whether he would look into the Stock Certificate. On or about September 8, 2006, RBC Centura Banks, Inc. refused Ms. Stratton's request for replacement stock certificates, unpaid stock, and unpaid dividends.[1]

On 20 September 2007, Ms. Stratton filed suit against RBC[2] seeking the following: (1) a declaratory judgment against RBC to the effect that Ms. Stratton is the owner of at least 14,486 shares of RBC common stock and any additional shares to which she might be entitled by virtue of accretion, stock dividends, and stock splits; (2) an order commanding RBC to issue those shares to her; and (3) recovery from RBC of any money dividends to which she would be entitled through these shares. RBC filed a motion for summary judgment. Ms. Stratton's memorandum in response to RBC's motion states the non-declaratory relief she is seeking is premised on two causes of action: conversion and unjust enrichment. That memorandum and Ms. Stratton's appellate brief suggest these claims are also premised on a "mistake" made by RBC, although the inner-workings of and legal support for this theory are not articulated.

In a detailed opinion, the trial court held (1) the doctrine of laches barred Ms. Stratton from seeking declaratory relief insofar as Ms. Stratton did not rely on a constructive trust theory; (2) the statute of limitations barred Ms. Stratton from seeking relief through a constructive trust theory; (3) the statute of limitations barred Ms. Stratton's conversion claim; and (4) the statute of limitations barred Ms. Stratton's unjust enrichment claim. The trial court granted RBC's motion for summary judgment. Ms. Stratton gave timely notice of appeal.

## II. Jurisdiction

We have jurisdiction over Ms. Stratton's appeal of right. *See* N.C. Gen. Stat. § 7A-27(b) (2009) (stating appeal lies of right to this Court from final judgments of a superior court).

---

1. The record does not disclose the precise date on which Ms. Stratton made her initial demand.

2. Ms. Stratton originally filed suit against RBC Centura Banks, Inc. By consent, RBC was substituted as the proper party defendant.

### III. Analysis

Summary judgment rulings are reviewed *de novo*. *Coastal Plains Utils. v. New Hanover Cnty.*, 166 N.C. App. 333, 340-41, 601 S.E.2d 915, 920 (2004). A trial court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). The court is required to view the evidence in the light most favorable to the non-moving party. *Perry v. Presbyterian Hosp.*, —— N.C. App. ——, ——, 703 S.E.2d 850, 853 (2011).

On appeal, Ms. Stratton argues the trial court erred in granting summary judgment in favor of RBC regarding each of her claims for relief. We address her conversion and unjust enrichment claims, her declaratory judgment claim, and the viability of a constructive trust in turn.[3]

### A. Ms. Stratton's Conversion and Unjust Enrichment Claims

Ms. Stratton argues the trial court incorrectly held section 1-52, the applicable statute of limitations, bars her conversion and unjust enrichment claims. We disagree.

After a defendant pleads the statute of limitations, the plaintiff has the burden of demonstrating she brought the action within the applicable limitation period. *Little v. Rose*, 285 N.C. 724, 727, 208 S.E.2d 666, 668 (1974). Whether a claim is time-barred is a mixed question of law and fact. *Id.* Summary judgment is an appropriate means of resolving this question if there are no genuine issues of material fact. *Id.*

In her memorandum in response to RBC's motion for summary judgment, Ms. Stratton listed three causes of action: declaratory judgment, conversion, and unjust enrichment (these claims are not articulated with specificity in her complaint). She argues her non-declaratory claims for relief are premised on a "mistake." Therefore, she contends, subsection 9 of section 1-52, which applies to claims seeking "relief on the ground of fraud or mistake," N.C. Gen. Stat. § 1-52(9) (2009), provides the applicable limitation period, rather than the subsections that typically apply to unjust enrichment and conversion claims.[4]

---

3. Neither party argues they are not bound by the conduct of their predecessor(s) in interest.

4. When arguing that her claims for relief should be based on "mistake," Ms. Stratton, in passing, raises the possibility that these claims *might* also be premised on fraud. Her brief's discussion of fraud is limited to the following statement: "Here, [the

Whether this proves correct is critical because the "discovery rule" applies to subsection 9. The discovery rule tolls the statute of limitations until the aggrieved party discovers or, through the exercise of reasonable diligence, should discover the mistake. *Lee v. Rhodes*, 231 N.C. 602, 602, 58 S.E.2d 363, 363 (1950) (per curiam). It is unclear when Ms. Inge or Ms. Stratton knew of the grounds for their claims. And when a party *should have* discovered the grounds for a claim is *generally* a jury question (making summary judgment inappropriate). *See, e.g., id.* at 603, 58 S.E.2d at 364 ("The evidence of the respective parties as shown in the record of case on appeal is in conflict, thus presenting a question for the jury . . . ."); *N.C. Nat'l Bank v. Carter*, 71 N.C. App. 118, 124, 322 S.E.2d 180, 184 (1984) (stating this principle in the context of a fraud claim). Therefore, we first address whether subsection 9 and the discovery rule are applicable.

According to Ms. Stratton, the "mistake" was RBC's "grossly negligent paperwork" through which it "lost . . . [P]laintiff and/or her predecessor as the owner of the stock certificate." However, Ms. Stratton misconstrues the term of art "mistake," which applies to the reformation or rescission of a contract or deed. A party seeking relief from a contract or deed must generally prove there was a *mutual* mistake by the parties. *E.g., Smith v. First Choice Servs.*, 158 N.C. App. 244, 249, 580 S.E.2d 743, 748 (2003). That mistake must occur during the making of the contract. *See Smith*, 158 N.C. App. at 249, 580 S.E.2d at 748 ("A mutual mistake exists when both parties to a contract proceed 'under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement.'" (quoting *Sudds v. Gillian*, 152 N.C. App. 659, 662, 568 S.E.2d 214, 217 (2002))). Ms. Stratton is *not* seeking relief from a transaction (entered into by Ms. Inge and an RBC predecessor) that is infected by mutual mistake.

Rather, it appears that, in order to secure a more favorable limitation period, she is clothing her claim for relief with the word "mistake" when she is in essence pursuing a conversion claim. In other words, she claims an RBC predecessor negligently, albeit unintentionally, converted her stock. She assumes subsection 9 applies merely because RBC made an error, but cites no authority for her

---

basis for the causes of action] should principally be 'mistake' though if the bank wants to have it considered as fraud, the plaintiff would have no objection." "The bank," i.e., RBC, responds that it has no desire for this Court to consider fraud as a basis for Ms. Stratton's claims. Therefore, we do not consider whether fraud can be coupled to Ms. Stratton's causes of action in order to secure a more favorable limitation period.

**STRATTON v. ROYAL BANK OF CANADA**

[211 N.C. App. 78 (2011)]

interpretation of subsection 9 or her theory of recovery. *See* N.C. R. App. P. 28(b)(6) (requiring "citations of the authorities upon which the appellant relies"). Our research yields no North Carolina decision applying the statute in this manner. On the other hand, there are ample cases indicating subsection 9 applies to the doctrine of mutual mistake, *e.g.*, *Hice v. Hi-Mil, Inc.*, 301 N.C. 647, 655, 273 S.E.2d 268, 272-73 (1981), which is not applicable here. We conclude subsection 9 and the discovery rule do not apply to Ms. Stratton's conversion and unjust enrichment claims.[5]

We now turn to whether the torts of conversion and unjust enrichment are barred by the applicable limitation periods. A conversion is "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Peed v. Burleson's, Inc.*, 244 N.C. 437, 439, 94 S.E.2d 351, 353 (1956) (internal quotation marks omitted). Conversion claims are subject to a three-year limitation period under subsection 4. N.C. Gen. Stat. § 1-52(4). As a general rule, the claim accrues, and the statute of limitations begins to run, when the unauthorized assumption and exercise of ownership occurs—not when the plaintiff discovers the conversion. *See, e.g.*, *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 309-11, 603 S.E.2d 147, 165-66 (2004) (concluding statute of limitations runs from the date of conversion, rather than discovery). However, when the defendant *lawfully* obtains possession or control and *then* exercises unauthorized dominion or control over the property, demand and refusal become necessary elements of the tort. *Hoch v. Young*, 63 N.C. App. 480, 483, 305 S.E.2d 201, 203 (1983) (quoting William L. Prosser, *The Law of Torts*, § 16, at 89-90 (4th ed. 1971)); *see also Trustees of Univ. of N.C. v. State Nat'l Bank*, 96 N.C. 280, 285-86, 3 S.E. 359, 361 (1887) ("In the case of a conversion by wrongful taking it is not necessary to prove a demand and refusal. So the wrongful assumption of the property and right of disposing of goods may be a *conversion in itself*, and render a demand and refusal unnecessary." (quoting 1 Joseph Chitty, *Chitty's Treatise on Pleading and Parties to Actions* 153 (1879))).

Ms. Stratton maintains the demand-and-refusal rule applies to this case and that accrual did not occur until 8 September 2006, when RBC Centura Banks, Inc. refused Ms. Stratton's request for replace-

---

5. The parties do not address the implications of the possibility that the stock escheated to the State and falls under a presumption of abandonment. *See* N.C. Gen. Stat. § 116B-53 (2009) (addressing the "presumptions of abandonment"). Therefore, we do not address this issue.

ment stock certificates, unpaid stock, and unpaid dividends. (This would bring Ms. Stratton's claim within the statute of limitations.) She argues this case is analogous to our decision in *Hoch v. Young*. There, the plaintiff originally gave the stock certificates, which were endorsed in blank, to a third party, who agreed to hold them in trust. *Hoch*, 63 N.C. App. at 481, 305 S.E.2d at 202. The defendant came into lawful possession of the plaintiff's stock certificates, although it is not clear how he acquired them from the third party. *See id.* at 482-83, 305 S.E.2d at 203. This Court applied the demand-and-refusal rule, holding that the jury could have properly found the defendant converted the stock when he refused to return the certificates. *Id.* at 483-84, 305 S.E.2d at 204.

In this case, however, Ms. Stratton has not alleged RBC gained lawful possession of her stock before converting it. Rather, her case relies on the allegation that neither RBC nor any third party purchased the stock from Ms. Inge. It is doubtful that an RBC predecessor could exercise control over the stock without actually converting it. In other words, the bank could not exercise lawful control over the stock, under these facts, prior to the *wrongful* exercise of control. Any assertion of ownership over the stock by RBC would be unlawful at the time the assertion first occurred. *See White*, 166 N.C. App. at 309-11, 603 S.E.2d at 165-66 (conversion occurred at the moment one defendant withdrew funds from plaintiffs' annuity without plaintiffs' permission; defendants' management of annuity fund did not equate to obtaining lawful possession before conversion). Consequently, the demand-and-refusal rule does not apply.

While the precise moment when an RBC predecessor exercised control over the stock cannot be ascertained at the summary judgment phase, we can determine the last possible date on which the conversion could have occurred. As our Supreme Court explained, "[i]t is the act of subscribing, or the registry of the stockholder's name upon the stock book" that gives the stockholder legal title to the stock. *Powell Bros. v. McMullan Lumber Co.*, 153 N.C. 52, 55, 68 S.E. 926, 927 (1910) (internal quotation marks omitted); *cf. Marzec v. Nye*, —— N.C. App. ——, ——, 690 S.E.2d 537, 541 (2010) (noting that, while *Powell Bros.* and other decisions are dated, they are still the law in this state). While RBC was unable to produce a stock ledger, it did provide a Bank of Manteo "stock list" indicating there were 7084 outstanding shares. Ms. Inge is not listed as a shareholder. The Bank of Manteo-Planters Bank merger document states there were 7084 shares at the time of

the merger. This indicates the Bank of Manteo did not recognize Ms. Inge as a shareholder in 1962, when the merger occurred.

Ms. Stratton objects to the use of the stock list for reaching this conclusion because it is "incomplete, misleading, and distorted." We disagree with this characterization. In making this assertion, Ms. Stratton references her stepson's affidavit, in which he points out that the stock list does not indicate when the list was made and who made it, among other things. He also avers that several certificates referenced by the document are not dated correctly. The "Stockholders Assent to Change" document, which indicated Ms. Inge was a shareholder, and was prepared in 1934, showed there were 142 outstanding shares at the time. Based on the increase in the number of Bank of Manteo shares, the stock list was clearly prepared after the "Stockholders Assent to Change" document, indicating Ms. Inge had previously been, but no longer was, a shareholder when the stock list was created. We believe the other irregularities do not raise a genuine issue of fact concerning whether the Bank of Manteo considered Ms. Inge to be a shareholder on the date of the merger. Furthermore, Ms. Stratton has forecasted no evidence suggesting the Bank of Manteo *did* consider her a shareholder at that time.

We conclude that, if RBC or one of its predecessors converted Ms. Inge's shares (possibly by re-selling them), it would have done so no later than 1962, when the merger occurred. Ms. Stratton has failed to meet her burden of establishing she brought her conversion claim within the statute of limitations.

A claim for unjust enrichment must be brought within three years of accrual under subsection 1 of section 1-52. *Housecalls Home Health Care, Inc. v. State,* —— N.C. App. ——, ——, 682 S.E.2d 741, 744 (2009) (citing N.C. Gen. Stat. § 1-52(1), (4)). Ms. Stratton contends the trial court's ruling on her unjust enrichment claim suffers from the same malady as the court's ruling on her conversion claim—namely, the claim did not accrue until demand and refusal. But she fails to point us to any case law suggesting the demand-and-refusal rule applies to unjust enrichment claims, or that the rule would apply differently than it does to conversion claims. *See* N.C. R. App. P. 28(b)(6) (requiring "citations of the authorities upon which the appellant relies"). We conclude her unjust enrichment claim could have accrued no later than 1962. Consequently, she failed to bring her claim within the time required by statute.

Ms. Stratton further maintains that, despite the foregoing analysis, the "continuing wrong doctrine" saves her conversion and unjust enrichment claims from the statute of limitations. The continuing wrong doctrine is an exception to the general rule that a cause of action accrues as soon as the plaintiff has the right to sue. *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003); *see also Marzec*, —— N.C. App. at ——, 690 S.E.2d at 542 ("Under the continuing wrong doctrine, the statute of limitations does not start running 'until the violative act ceases.' " (quoting *Babb v. Graham*, 190 N.C. App. 463, 481, 660 S.E.2d 626, 637 (2008)) (internal quotations marks omitted)). However, in order for the continuing wrong doctrine to toll the statute of limitations, the plaintiff must show "[a] continuing violation" by the defendant that "is occasioned by continual unlawful acts, *not by continual ill effects from an original violation*." *Marzec*, —— N.C. App. at ——, 690 S.E.2d at 542 (alteration in original) (internal quotation marks omitted). When a court determines whether the doctrine applies, it should consider "[t]he particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Williams*, 357 N.C. at 179, 581 S.E.2d at 423 (quoting *Cooper v. United States*, 442 F.2d 908, 912 (7th Cir. 1971)).

Ms. Stratton argues the doctrine applies because RBC has continually deprived her of shareholder rights, including her right to stock and cash dividends. We disagree.

We recently held the "continuing wrong" doctrine applied in *Marzec v. Nye*, where the defendant allegedly failed to pay the plaintiff's salary on a monthly basis. —— N.C. App. at ——, 690 S.E.2d at 543-54. There, it appears the parties had a continuing, albeit severely strained, business relationship, but at no point was the plaintiff's employment expressly terminated. *Id. passim.* The doctrine also tolled the statute of limitations in *Babb v. Graham*, where the trustee continuously refused to make distributions to the trust beneficiaries. 190 N.C. App. at 481, 660 S.E.2d at 637 (2008). The trustee did not convert the entire trust for his own purposes; rather, he continuously refused to make distributions for reasons unrelated to the trust. *Id.* at 477, 660 S.E.2d at 635. Unlike in *Marzec* and *Babb*, the continuing wrongs alleged in this case—the deprivation of shareholder rights and nonpayment of dividends—are clearly the continual ill effects of one antecedent wrong: the alleged conversion of Ms. Stratton's stock. Our readings of *Marzec* and *Babb* disclose no such clear-cut wrong precipitating the subsequent injuries to the plaintiffs in those cases.

As the Seventh Circuit has explained, the continuing wrong doctrine

is premised, at least in part, on the idea that where a cause of action arises from the cumulative nature or impact of a series of acts that occur over time, it can be difficult for the plaintiff to discern at any particular point during that time the wrongful and injurious nature of the defendant's conduct.

*Rodrigue v. Olin Emp. Credit Union*, 406 F.3d 434, 445 (7th Cir. 2005); *cf. Williams*, 357 N.C. at 179, 581 S.E.2d at 423 (citing numerous federal opinions as persuasive in this area of law). The conversion of Ms. Stratton's stock was a discrete occurrence—not a cumulative one—that should have been discovered through reasonable diligence. That the precise moment of conversion may be difficult to discover does not change our calculus. And even though Ms. Inge may not have been on immediate notice of the conversion, this does not justify remaining idle for several decades. At some point shortly after the stock conversion, it should have become obvious to Ms. Inge she was no longer a shareholder. Applying the continuing wrong doctrine under these facts would discourage shareholders from promptly investigating and litigating stock conversion claims, thereby defeating the policy objectives advanced by statutes of limitations.

This leads us to three conclusions: (1) the continued deprivation of shareholder rights and nonpayment of dividends were not continual violations, but rather "continual ill effects" of the conversion; (2) policy considerations militate against applying the continuing wrong doctrine; and therefore, (3) the trial court correctly ruled that the doctrine does not apply.

Ms. Stratton also argues the doctrine of equitable estoppel bars RBC from asserting statutes of limitations defenses. We disagree.

"[A] defendant may properly rely upon a statute of limitations as a defensive shield against 'stale' claims, but may be equitably estopped from using a statute of limitations as a sword, so as to unjustly benefit from his own conduct which induced a plaintiff to delay filing suit." *Friedland v. Gales*, 131 N.C. App. 802, 806, 509 S.E.2d 793, 796 (1998) (citing *Duke Univ. v. Stainback*, 320 N.C. 337, 341, 357 S.E.2d 690, 692 (1987)). The jury must resolve factual disputes pertaining to the elements of equitable estoppel. *Id.* at 809, 509 S.E.2d at 798. However, when there is no genuine issue of material fact, the question of estoppel is one for the court. *White*, 166 N.C. App. at 305, 603 S.E.2d at 162.

The essential elements of estoppel are (1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice.

*Friedland*, 131 N.C. App. at 807, 357 S.E.2d at 796-97 (quoting *Parker v. Thompson-Arthur Paving Co.*, 100 N.C. App. 367, 370, 396 S.E.2d 626, 628-29 (1990)). "[N]either bad faith, fraud nor intent to deceive is necessary before the doctrine of equitable estoppel can be applied." *Id.* (quoting *Parker*, 100 N.C. App. at 371, 396 S.E.2d at 629) ("Iteration in original). The party invoking equitable estoppel has the burden of pleading sufficient facts to satisfy the elements. *Id.*

Ms. Stratton maintains the trial court incorrectly ruled she could not rely on the doctrine for two reasons. First, she argues the doctrine applies because RBC failed to comply with statutorily mandated record-keeping requirements. *See* N.C. Gen. Stat. § 53-100 (2009) (requiring banks to maintain certain records). Second, she argues there are genuine issues of material fact related to the doctrinal elements—specifically, what Ms. Inge and Ms. Stratton knew and when they knew it. However, even if knowledge and reliance hinge on disputed facts, Ms. Stratton has failed to forecast evidence indicating RBC made a false representation or concealed material facts. Nor does she point us to any evidence that RBC intended for her to rely on any such misrepresentation or concealment.

While we recognize RBC's alleged record-keeping errors may have harmed Ms. Stratton, equitable estoppel is not premised on a relative scale of blameworthiness. A party cannot use it to bypass a statutory limitation defense without satisfying its doctrinal elements. Our review indicates the trial court properly ruled as a matter of law that Ms. Stratton could not rely on the doctrine to overcome RBC's statute of limitations defense.

## B. Ms. Stratton's Declaratory Judgment Claim

Ms. Stratton argues the trial court improperly concluded she and Ms. Inge were guilty of laches. We disagree.

The doctrine of laches is "designed to promote justice by preventing surprises through the revival of claims that have been

STRATTON v. ROYAL BANK OF CANADA

[211 N.C. App. 78 (2011)]

allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49, 88 L. Ed. 788, 792 (1944). It is an appropriate defense to Ms. Stratton's claim for declaratory judgment. *See, e.g., Taylor v. City of Raleigh*, 290 N.C. 608, 622, 227 S.E.2d 576, 584 (1976) ("pproving the assertion of the doctrine of laches in declaratory relief proceedings because they resemble equitable proceedings); *cf. Richmond Cedar Works v. John L. Roper Lumber Co.*, 168 N.C. 391, 395, 84 S.E. 521, 522 (1915) (observing that " 'laches are often a defense wholly independent of the statute of limitations.' " (quoting *Simmons v. Burlington, C.R. & N.R. Co.*, 159 U.S. 278, 292, 40 L. Ed. 150, 155 (1895))). Determining whether Ms. Stratton's claim is barred by laches requires us to consider two questions: (1) whether the pleadings, affidavits, and exhibits show any dispute as to the facts upon which RBC relies to show Ms. Stratton is guilty of laches; and (2) if not, whether the undisputed facts, if true, establish laches. *Taylor*, 290 N.C. at 621, 227 S.E.2d at 584. The burden of proof rests with the party pleading laches as a defense. *Id.* at 622, 227 S.E.2d at 584. An adverse party may not, however, rely on her complaint alone to establish a genuine issue of material fact; she "must set forth specific facts showing that there is a genuine issue for trial" by affidavits or other means authorized by North Carolina Rule of Civil Procedure 56. *Id.*

> To establish the affirmative defense of laches, our case law recognizes that 1) the doctrine applies where a delay of time has resulted in some change in the condition of the property or in the relations of the parties; 2) the delay necessary to constitute laches depends upon the facts and circumstances of each case; however, the mere passage of time is insufficient to support a finding of laches; 3) the delay must be shown to be unreasonable and must have worked to the disadvantage, injury or prejudice of the person seeking to invoke the doctrine of laches; and 4) the defense of laches will only work as a bar when the claimant knew of the existence of the grounds for the claim.

*Farley v. Holler*, 185 N.C. App. 130, 132-33, 647 S.E.2d 675, 678 (2007) (quoting *MMR Holdings, LLC v. City of Charlotte*, 148 N.C. App. 208, 209-10, 558 S.E.2d 197, 198 (2001)).

Our review indicates Ms. Stratton was not justified in failing to bring suit in a timely fashion. After discovering the Stock Certificate, she examined historical Bank of Manteo stock certificates at Planters

Bank. She did not, however, mention her mother's stock to anyone at the bank. Shortly thereafter, she met with her stockbroker and several attorneys regarding the value of the stock. These consultations occurred in 1987 at the latest—almost twenty years before Ms. Stratton communicated a demand to RBC. While she was informed it would take a large sum of money to investigate the matter by one attorney, and that she should "leave the matter alone" by a stockbroker, we fail to see why this justified such a lengthy delay.

Ms. Stratton's unjustified delay prejudiced RBC, which is currently unaware of any living person who has material information concerning the Stock Certificate. The lengthy delay likely contributed to the lack of documentary evidence. Ms. Stratton contends RBC was not prejudiced and was actually *benefited* by the delay because RBC converted her stock. She misunderstands the "prejudice element" of the laches doctrine. It does not relate to whether a party was prejudiced by the underlying cause of action. Rather, it refers to whether a defendant has been prejudiced in its ability to defend against the plaintiff's claims by the plaintiff's delay in filing suit.

Ms. Stratton also maintains summary judgment was inappropriate because the parties dispute whether she subjectively knew a cause of action was available to her. She is correct that much of our case law, including the passage quoted above, suggests Ms. Stratton must have actual knowledge of the grounds for her declaratory judgment claim in order for laches to apply. However, a party may be charged with constructive knowledge of the grounds for her claim when it is clear that a party had ample notice of those grounds. *See Save Our Sch. of Bladen Cnty., Inc. v. Bladen Cnty. Bd. of Educ.*, 140 N.C. App. 233, 236-37, 535 S.E.2d 906, 909 (2000) (charging plaintiff with knowledge of the grounds for its claim).

The trial court correctly charged Ms. Stratton with knowledge of the grounds for her claim. Documentary evidence suggests the year-round population of Manteo was about 600 people when the Bank of Manteo-Planters Bank merger occurred. The merger was publicized in an article on the front page of the Coastland Times, Manteo's only newspaper, and an advertisement accompanied the article on another page. The Bank of Manteo was the only bank in Manteo when the merger occurred. Ms. Inge, who was highly educated, resided in Manteo for all but a few years of her life. She was exposed to ample evidence of the merger and of the grounds for a claim when she was not compensated for her Bank of Manteo stock.

It would also be proper to charge Ms. Stratton with knowledge of the grounds for her claim—irrespective of what Ms. Inge knew. Ms. Stratton received a new checkbook from Planters Bank in the mid-1960s informing her that her Manteo Bank account had become a Planters Bank account. Ms. Stratton discovered the Stock Certificate following her mother's death; however, when closing her mother's estate while serving as executrix, Ms. Stratton did not list the stock as an estate asset because she felt it had little value. Ms. Stratton knew the Bank of Manteo merged with Planters Bank. After her visit to Planters Bank to view the historical stock certificates, Ms. Stratton knew that, at some point, her mother owned stock in a predecessor to Planters Bank. She knew Ms. Inge did not have a Planters Bank stock certificate. It was also apparent that dividends or stockholder correspondence were not arriving for Ms. Inge after her death. This is clear indicia that Planters Bank did not view Ms. Inge as a shareholder.

When she learned substantial investigation was needed upon inquiring into the stock value, it should have become all the more apparent that the question of stock ownership was a complex, potentially contested matter that could only become more difficult to untangle as a result of further delay. It was only through Ms. Stratton's failure to bring the issue to the attention of Planters Bank that she failed to gain actual knowledge that Planters Bank did not view her mother as a shareholder. We conclude Ms. Inge and Ms. Stratton had ample notice of the grounds for their claim. Ms. Stratton slept on her rights for at least twenty years. Both Ms. Inge and Ms. Stratton negligently failed to assert their rights, assuming they had any, and RBC was prejudiced as a result. To rule otherwise would encourage shareholders to sleep on their rights by insisting they had no subjective knowledge that they could bring suit. The trial court correctly concluded laches barred Ms. Stratton's claim for declaratory relief.

## C. Constructive Trust

Finally, Ms. Stratton argues the trial court incorrectly concluded it could not impose a constructive trust on RBC's assets because the remedy was barred by the applicable statute of limitations. We disagree.

Generally, an action seeking a constructive trust must be commenced no more than ten years after the wrong giving rise to the trust occurs. *Teachey v. Gurley,* 214 N.C. 288, 294, 199 S.E. 83, 87-88 (1938); *Laster v. Francis,* —— N.C. App. ——, ——, 681 S.E.2d 858, 861 (2009); *see also* N.C. Gen. Stat. § 1-56 (2009) (stating that claims for relief not covered by other limitation periods "may not be com-

menced more than 10 years after the cause of action has accrued"). But where fraud or mistake forms the basis for imposing the constructive trust, the limitation period applicable to fraud and mistake controls. *See J. Lee Peeler & Co. v. Makepeace*, 96 N.C. App. 118, 119-20, 384 S.E.2d 283, 283-84 (1989). Ms. Stratton contends that, because a "mistake" deprived her of her stock, the statute did not begin to run until she discovered the mistake. Again, Ms. Stratton cites no authority for the proposition that a bookkeeping error sounding in negligence should be subject to the discovery rule embodied in section 1-52, subsection 9. *See* N.C. R. App. P. 28(b)(6) (requiring "citations of the authorities upon which the appellant relies"). We reject this argument for the same reasons expressed in Part III.A *supra*.

Because the conversion of Ms. Inge's stock could have occurred no later than 1962, *supra* Part III.A, we conclude the trial court properly determined Ms. Stratton's lawsuit is barred by the ten-year limitation period contained in section 1-56 insofar as it relies on the imposition of a constructive trust.

## IV. Conclusion

For the foregoing reasons, the decision of the trial court is Affirmed.

Judges STEELMAN and STEPHENS concur.