Blythe v. Bell, 2013 NCBC 7.

STATE OF NORTH CAROLINA

COUNTY OF CATAWBA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
11 CVS 933

WILLIAM A. B. BLYTHE (individually
and in his capacity as shareholder) and
DRYMAX SPORTS, LLC,

    Plaintiffs,

   v.

ROBERT E. BELL III, VIRGINIA
BELL, NISSAN JOSEPH and
HICKORY BRANDS, INC.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT**

{1}  THIS MATTER is before the court on motions for summary judgment filed by all Parties pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). The court ruled on the motions in part by its December 10, 2012 Order and now addresses remaining issues raised by the motions. For the reasons stated below, Plaintiffs' Motion as to Defendants' counterclaim is GRANTED, and Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part.

> *Moore & Van Allen, PLLC by James P. McLoughlin, Jr., Mark A. Nebrig, Benjamin P. Fryer, Frank E. Schall, and Christopher D. Tomlinson for Plaintiffs William A. B. Blythe and Drymax Sports, LLC.*

> *Ellis & Winters, LLP by Andrew S. Chamberlin and C. Scott Meyers, and Young, Morphis, Bach & Taylor, LLP by Paul E. Culpepper and Kevin C. McIntosh for Defendants Robert E. Bell III, Virginia Bell, Nissan Joseph, and Hickory Brands, Inc.*

Gale, Judge.

## I.    INTRODUCTION

{2}    This litigation involves disputes relating to the ownership, management, operation, and sharing of expected profits and opportunities of Drymax Sports, LLC ("Drymax"), a North Carolina limited liability company ("LLC") whose members include individual Plaintiff William A. B. Blythe ("Blythe"), corporate Defendant Hickory Brands, Inc. ("HBI"), and individual Defendants Robert E. Bell III ("Rob Bell"), Virginia Bell, and Nissan Joseph ("Joseph").

{3}    The pending motions for summary judgment include a tangle of interrelated issues arising from the Amended Complaint, which includes 358 numbered paragraphs and asserts 18 claims, including both individual and derivative claims which overlap substantially, and from an answer with affirmative defenses and a counterclaim.  The Parties filed a total of 265 pages in briefs, as well as extensive appendices.  Oral argument on the summary judgment motions encompassed an entire day, and the Parties have submitted supplemental briefing after oral argument.

{4}    To analyze these issues, the court distilled the competing central storylines that center on discussions surrounding and agreements, if any, reached at Drymax's formation in 2003 following an earlier business venture between Blythe and HBI which had begun in 2001.  In 2001, HBI purchased certain assets, including certain patents from SecondWind Products, Inc. ("SecondWind"), which Blythe founded, Blythe retained control of certain trademarks, including ActiveDry® and Drymax®, an individual Dan Talbott ("Talbott") maintained control of the proprietary process, which the court refers to as the "Drymax Process," which is used to apply a chemical applicant to provide desirable stay-dry properties, and HBI, SecondWind, Blythe, and Talbott executed a License and Supply Agreement pursuant to which HBI was authorized to manufacture and sell socks using the Active Dry® or Drymax® trademarks to which the Drymax Process had been applied in exchange for paying Blythe and Talbott royalties.

{5}     There were a number of documents generated around the time of Drymax's formation, which Plaintiffs have referred to as "Foundational Documents" and which are critical to their claims.  These include a Drymax Operating Agreement which was never fully adopted, board minutes of both Drymax and HBI, and an "Operational Agreement," which Plaintiffs assert is a binding agreement between Drymax and HBI.  The Parties have fundamentally different views of these documents.  Plaintiffs say the documents reflect understandings relating to the pursuit of any product based on the Drymax Process, and that the sale and manufacture of socks would at some point in the future shift from SecondWind branded socks sold under the License and Supply Agreement to a new launched Drymax branded sock line which would be sold by Drymax rather than HBI, and that the royalty stream would cease in favor of the formula agreement in the Operational Agreement by which HBI would be paid a percentage based on costs of goods sold for logistical support but would otherwise enjoy profits only as a Drymax member.  Defendants deny that the Operational Agreement is a binding agreement in the first instance, but even if it is, it never applied to the sale of socks, and that socks sales have continued pursuant to the royalty arrangement of the License and Supply Agreement which has never been terminated.

{6}     The claims are interrelated in that Blythe contends that Defendants have refused to acknowledge the Operational Agreement and that HBI has continually misappropriated opportunities owed to Drymax, have made decisions on HBI's behalf to the detriment of Drymax, and have throughout this course of conduct unfairly excluded Blythe from management and enjoyment of his reasonable expectations.  Defendants challenge the entire set of Plaintiffs' claims on the assertion that they rest on the fundamental predicate that the Operational Agreement is an enforceable agreement applicable to socks, and further that any such claims are now time barred.  Plaintiffs' method of computing its damages is the subject of separate motions *in limine.*

{7}     In an effort to approach the interrelated issues in a logical fashion, the court first addresses Defendants' attack on Blythe's standing.  Second, the court

identifies claims the Plaintiffs have abandoned. Third, the court examines whether any Drymax member has adequately supported a claim based on a fiduciary duty owed directly by one member to another member. Fourth, the court addresses Defendants' assertion that the Operational Agreement cannot be enforced, and whether alleged breaches of fiduciary duties owed to Drymax or Blythe's individual claims depend entirely on that agreement or also include other claims. Fifth, the court assesses how Defendants' limitations defense applies to these various claims.

{8}     For purposes of the present motions, the court notes one issue the Parties have not addressed and makes an assumption in Blythe's favor on that issue. In *Meiselman v. Meiselman*, the North Carolina Supreme Court held that when a shareholder brings suit seeking dissolution or other appropriate relief under the North Carolina General Corporation Act, the trial court is: "(1) to define the 'rights or interests' the complaining shareholder has in the corporation; and (2) to determine whether some form of relief other than dissolution is 'reasonably necessary' for the protection of those 'rights or interests.'" 309 N.C. 279, 301, 307 S.E.2d 551, 564 (1983). The right the court recognized grew from the statutory remedy, and was based on certain policies inherent in the statutory scheme. The North Carolina courts have not yet had to address whether similar provisions in the North Carolina Limited Liability Act ("LLC Act") embodies the same policies that should equally lead to granting a minority owner in a limited liability company similar rights to protect his reasonable expectations as a minority owner. There are possible arguments on either side of this proposition, but those issues have not been addressed by the pending motions and the court considers any necessary consideration of them to another day. *See* Douglas K. Moll, *Minority Oppression & the Limited Liability Company: Learning (or not) from Close Corporation History*, 40 WAKE FOREST L. REV. 883 (2005).

## II.    PROCEDURAL HISTORY

{9}     Plaintiffs filed their Complaint in Catawba County Superior Court on March 22, 2011, and their Amended Complaint on July 28, 2011.  Defendants sought designation as a complex business case based on later amendments, on March 16, 2012 the matter was designated as a mandatory complex business case by Order of Chief Justice Sarah Parker, and then assigned to the undersigned.

{10}    All Parties timely filed post-discovery summary judgment motions on October 9, 2012.  The court heard oral argument on November 16, 2012.  Plaintiffs filed a Supplemental Motion on December 3, 2012, which seeks to add additional documents to be considered in opposition to Defendants' motions and to reopen discovery based on Defendants' alleged discovery abuses.  By Order dated January 4, 2013, the court accepted additional documents as a part of the record to be considered but denied the request to reopen discovery.  The court considers each of the summary judgment motions now ripe for disposition.

## III.    STATEMENT OF RELEVANT FACTS

{11}    The court does not make findings of fact when ruling on a motion for summary judgment but examines whether the record establishes uncontested facts or the absence of evidence to support facts which demonstrate that the claims can be resolved as a matter of law without the necessity of trial proceedings.  *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 215 S.E.2d 162 (1975).  For purposes of assessing the motions, any contested fact has been assumed in favor of the Party opposing summary judgment.

### A.   The Parties

{12}    Drymax is a North Carolina limited liability company whose members are Blythe, HBI, Rob Bell, Virginia Bell, and Joseph.  Joseph was HBI's

president and chief executive officer of HBI from May 2003 until January 2008. (Am. Compl. ¶ 24.)

## B. Drymax's Formation

{13} Blythe has been involved in the footwear accessory, sock, and athletic apparel industry for approximately 29 years and was the founder and sole owner of SecondWind. (Blythe Aff. ¶¶ 5–6, Oct. 21, 2011.) In 2001, Blythe sold most of SecondWind's assets to HBI (the "Asset Purchase Agreement"), which was then controlled by Robert E. Bell II ("R.E. Bell II"), the father of Rob Bell and Virginia Bell. (Blythe Dep. Vol. I 65:12–66:2.) HBI entered a License and Supply Agreement with SecondWind, Blythe, and Talbott to sell socks using trademarks Active Dry®, Drymax®, and MicroZap® ("Trademarks"). (Blythe Aff. ¶ 2, Oct. 25, 2012; Blythe Dep. Vol. III 516:20–517:9; Blythe Dep. Ex. 130.) The License and Supply Agreement states that Blythe owns the Trademarks (Blythe Aff. ¶ 22, Oct. 25, 2012; Blythe Dep. Ex. 130) and Talbott owns the trade secret underlying the Drymax Process. (Blythe Dep. Vol. III 517:10–18; Blythe Dep. Ex. 130.) The Drymax Process is now licensed by Talbott's successor, Russ Roberts ("Roberts"). Neither Blythe nor Drymax have any written or oral agreements with Talbott or Roberts authorizing the use of the Drymax Process other than the License and Supply Agreement. (Blythe Dep. Vol. III 513:22–514:25.)

{14} In 2003, Blythe indicated his intent to terminate the License and Supply Agreement. (Blythe Aff. ¶ 2, Oct. 25, 2012.) R.E. Bell II requested instead that Blythe and Joseph, HBI's President, discuss a new venture to pursue the Drymax Process. (Blythe Dep. Vol. I 95:19–96:25, 97:1–17; Joseph Dep. 8:13–15.)

{15} R.E. Bell II and his wife died in a plane crash before any venture was formalized. Rob Bell and Virginia Bell became the majority owners of HBI and served as HBI officers. (Virginia Bell Dep. 11:6–7, 25:5–12.) The Parties continued discussions and Drymax was formed on November 6, 2003. (Blythe Dep. Vol. I 122:14–125:12, Blythe Dep. Ex. 102.) The members agreed to the following initial

division of ownership:  Blythe 40%; HBI 30%; Joseph 20%; Rob Bell 5%; and Virginia Bell 5%.  (Blythe Dep. Ex. 104.)

{16}    Several transfers of membership interests were made between or among the original members, and the Parties disputed the effect of these transfers on management control.  Those disputes were the subject of the court's December 10, 2012 Order which determined that the current ownership and control of Drymax as follows: (1) Blythe owns a 40% economic interest and a 40% control interest; (2) HBI owns a 20% economic interest and 0% control interest; (3) Joseph owns a 0% economic interest and a 20% control interest; (4) Rob Bell owns a 20% economic interest and a 20% control interest; and (5) Virginia Bell owns a 20% economic interest and a 20% control interest.  As a result, no single member owns a controlling interest.

## C.    An Initial Drymax Operating Agreement Was Drafted

{17}    An attorney prepared a Drymax Operating Agreement (the "Operating Agreement") on or about November 26, 2003. (Am. Compl. ¶ 35.)  Blythe contends he signed and returned the agreement to Joseph without changes.  (Blythe Dep. Vol. I 138:4–141:25.)  Defendants testified that they never signed the Operating Agreement.  (Rob Bell Dep. 192:10–195:1; Virginia Bell Dep. 44:7–45:9; Joseph Dep. 87:25–89:3.)  Plaintiffs filed initial claims to enforce the Operating Agreement but they no longer seek to enforce it as a binding agreement, although they believe it may have evidentiary value in interpreting other claims.  (Pls.' Resp. to Defs.' Mot. for Summ. J. (hereinafter "Pls.' Resp. Br.") 71.)

## D.    Board Minutes and the "Operational Agreement"

{18}    The Drymax members held their first member meeting on January 15, 2004.  (Blythe Dep. Ex. 104.)  The minutes of this meeting reflect the initial ownership percentages and reflect that the members by unanimous consent elected

a board of directors consisting of all of the individual members.  (Blythe Aff. ¶ 17, Oct. 25, 2012; Blythe Dep. Ex. 104.)  A Drymax board meeting was then held that same day.  The minutes of that meeting reflect several matters, including that:  (1) Blythe would be Drymax's Managing Member; (2) all financial and strategic decisions would be made with the Board's authorization; (3) "HBI will add 20% to all goods sold on behalf of Drymax LLC" to include services of inventory management, supplier reorders, order picking and processing, logistics and warehousing, cost of labor for packaging, and financial accounting, but excluding package costs, outbound freight, and defects; (4) Drymax would provide a note to HBI for legal and product developments to date; (5) Drymax would borrow additional funds for molds and operational costs at an interest rate of 4.5% until "sales are able to provide it;" and (6) Blythe would initiate and coordinate transferring Drymax trademarks.  (Blythe Dep. Ex. 104.)

{19}    On February 1, 2004, Joseph emailed Blythe stating that HBI's Board had met and decided that HBI and Drymax Sports should enter into a working agreement.  (Blythe Dep. Vol. I 180:6–15.)  Joseph attached a document entitled "Operational Agreement" which Joseph indicated he was prepared to sign on HBI's behalf.[1]  (Blythe Dep. Ex. 105.)  The Operational Agreement contained language similar to the January 15, 2004 Drymax Board minutes, with some variation. Among other language, the Operational Agreement included the following terms: (1) HBI would loan development costs to include but not be limited to enumerated categories; (2) Drymax would repay the greater of 4.5% or Prime plus 0.05%; (3) HBI would have a 30% equity stake in Drymax; (4) HBI would charge a "20% mark up on cost of goods to cover the costs related to services," with the enumerated services being similar to but not an exact match for the categories enumerated in Drymax's board minutes; (5) certain sales expenses were to be Drymax's responsibility; and (6) Drymax could not change agreements without HBI's consent.

---

[1] The court here assumes that Blythe sign and approved the Operational Agreement. Cites in the brief refer to Blythe's testimony regarding approval of the Operating Agreement.

{20}     Plaintiffs contend that both the Drymax board minutes and the Operational Agreement apply to socks and would in the future replace the royalty agreement in the License and Supply Agreement.  Plaintiffs emphasize that the agreement was "that HBI will add 20 percent to <u>all goods sold on behalf of Drymax, LLC.</u>" (Blythe Dep. Ex. 104, (emphasis added); Blythe Dep. Vol. II 257:7–22.) Defendants contend that if arrangements were intended to apply to the sale of socks, the Parties would have made express reference to and provided for termination of the License and Supply Agreement which by its own terms continues to renew automatically until terminated.  (Defs.' Br. in Supp. of Their Mot. for Summ. J. as to Claims by Drymax Sports, LLC (hereinafter Defs.' Br. in Supp.) 6; Blythe Dep. Ex. 105.)  Defendants seek to support their position by evidence that Blythe thereafter accepted royalties and Drymax continues to accept royalties. Blythe acknowledges that HBI sold Active Dry branded and later Drymax branded socks pursuant to the License and Supply Agreement after Drymax was formed (Blythe Dep. Vol. I 216:17–217:13), but contends that these sales were only to continue until Drymax was prepared to launch a new Drymax branded line, which it has never been able to do solely because of Defendants' wrongful conduct. (*Compare*, Defs.' Br. in Supp. 19–21 *and* Pls.' Resp. Br. 42.)  The Parties also disagree on the point in time at which it may be asserted that Drymax would have been ready to launch the new product line so as to trigger the Operational Agreement.  As discussed below, that date may be critical to the limitations defense, at least as to certain claims.

## E.    Drymax Begins Operations

{21}     HBI provided Drymax an initial line of credit to finance development efforts.  (Lasecki Aff. ¶ 5; Blythe Dep. Ex. 104.)  Blythe alleges that at some point, HBI charged excessive interest on amounts it advance but reverted to the agreed 4.5% around the time the lawsuit was filed.  (Am. Compl. ¶ 99–101.)  Defendants

stress that HBI has provided Drymax with all back office and administrative support. (Lasecki Aff. ¶ 6.)

{22} Blythe contends that he assigned the Trademarks first licensed by the License and Supply Agreement to Drymax on May 21, 2004 in consideration for his 40% share in Drymax and his expectation that he would be allowed to participate in the control and management of Drymax. (Blythe Aff. ¶ 22, Oct. 25, 2012.) Blythe understood that all members would share pro rata in the company's distributions, profits, and costs. (Blythe Aff. ¶¶ 24–25, Oct. 25, 2012.)

{23} When Drymax was formed, HBI's product line included insoles, but its line did not employ the Drymax Process. (Blythe Dep. Vol. II 407:14–22; 199:23–201:20.) HBI then contributed its insole patents acquired from SecondWind to Drymax and Drymax launched a new insole product line. (Blythe Dep. Vol. I 136:17–137:2.) HBI loaned Drymax the development costs for these insole products sold under the Drymax name. (Blythe Dep. Vol. I 204:19–23.)

{24} Drymax began selling the "X-Soles" in 2006 and booked the sales as sales by Drymax. (Lasecki Aff. ¶ 11.) Blythe contends that HBI well understood the terms of the Operational Agreement as evidence by the fact that Drymax paid HBI the cost of goods sold plus 20% of the X-Soles' sales. (Blythe Dep. Vol. I 207:22–210:3.) The License and Supply Agreement was in effect in 2006 when Drymax began selling X-Soles, and at that time HBI continued selling Active Dry labeled socks and paying royalties individually to Blythe and Talbott. (Blythe Dep. Vol. I 216:17–217:13.)

{25} From time to time, Drymax bought socks utilizing the Drymax Process from HBI at wholesale prices, which Drymax then resold at retail prices at various marathon events. (Blythe Dep. Vol. II 365:14–366:4; Lasecki Aff. ¶ 8.) These sales were booked in Drymax's accounting records as purchases for resale and no 20% service charge was paid to HBI on such sales. (Lasecki Aff. ¶ 10.)

{26} The Parties agree that HBI sold socks pursuant to the License and Supply Agreement from 2004 to April 2007, and that HBI paid royalties on these sales which were received by Blythe individually with no payment to Drymax, and

the 20% markup arrangement from the Operational Agreement was not applied to those sales. (Blythe Dep. Vol. I 214:17–217:13.) The Parties agree that at some point socks which had been previously branded as Active Dry were branded as Drymax and still sold pursuant to the terms of the License and Supply Agreement with Blythe receiving royalties individually. (Blythe Dep. Vol. I 215:11–216:23.)

{27} Blythe, however, asserts that HBI was to continue to sell SecondWind branded socks and pay the 5% royalty only until the launch of a new Drymax product line was ready. (Blythe Dep. Vol. I 217:1–23.) Blythe contends that once the Drymax products were designed, the necessary packaging was prepared, and marketing was in place, SecondWind branded products were to disappear, and with them the royalty arrangement, and thereafter sales would be booked at Drymax, Drymax would pay HBI the agreed upon cost of goods plus 20% in accordance with the Operational Agreement, and members would enjoy profits only as Drymax members sharing in accordance with their ownership. (Blythe Dep. Vol. I 217:23–218:24.) As stated above, Defendants contend that the Operational Agreement was never meant to apply to the sale of socks in the first instance and that sock sales are to be governed exclusively by the License and Supply Agreement. (Defs.' Br. in Supp. 19–21.)

{28} The License and Supply Agreement states that it automatically renews on an annual basis unless it is terminated in writing. (Blythe Dep. Ex. 130 ¶ 7.) It further provides that it can only be modified via a writing executed by all parties, but allows royalty payments to be assigned without such a written modification. (Blythe Dep. Ex. 130 ¶¶ 7, 15.) Blythe testified that he agreed in 2007 that the 5% royalty payment pursuant to the License and Supply Agreement would no longer be paid to him individually but instead would be paid to Drymax. (Blythe Dep. Vol. I 217:14–218:15; Blythe Aff. ¶ 31, Oct. 25, 2012.) This Agreement reflected his understanding that the time to launch the Drymax product line had approached and the Operational Agreement should be implemented for the new line of socks. He also thought at the time that in transferring the royalty stream to Drymax, the royalty payments would continue for a "temporary period" while Drymax's

accounting system was modified to accommodate the new arrangements. Blythe contends he discussed this temporary continuation of royalties with Joseph as reflected in an email exchange.[2] (Blythe Dep. Vol. I 218:25–219:5.) Blythe contends that the temporary period was to be for approximately 30 to 60 days to facilitate an accounting change (Blythe Dep. Vol. I 221:11–222:3), which he assumed meant a change over to the terms of the Operational Agreement. (Blythe Dep. Vol. I 224:13–25.) Defendants deny there was ever any agreement to suspend royalties. (Blythe Dep. Vol. I 217:8–23; 218:7–219:4.)

{29} Defendants instead contend that the License and Supply Agreement remains in effect today, that there has been no written termination or modification of it. HBI continues to pay royalties pursuant to the License and Supply Agreement, although payments are now being paid to Drymax. (Defs.' Br. in Supp. 9; Lasecki Aff. ¶ 19.) In January 2010, HBI increased the royalty payment from 5% to 10% (Blythe Dep. 227:16–19; Lasecki Aff. ¶ 18), at which time it stopped advancing funds to Drymax. (Lasecki Aff. ¶ 18.) Blythe contends that he objected when this change was made. (Blythe Dep. Vol. I 228:18–229:2.)

## F. Plaintiffs' Assertion of Alleged Conflicts of Interest

{30} Blythe contends that Defendants have improperly excluded him from management of Drymax and in doing so have taken actions that are not in the best interests of Drymax. (Blythe Aff. ¶ 35, Oct. 14, 2011.) Blythe particularly complains of Rob Bell's assertion that he controls Drymax due to his control of HBI and HBI's exclusive control of Drymax's accounting and finances. Blythe contends that in addition to failing to honor Drymax's rights under the Operational Agreement, Defendants' various acts also fail to honor Blythe's legitimate

---

[2] A series of emails were exchanged between Lisa Lasecki, an HBI employee, and Blythe regarding the royalty payment being paid to Drymax beginning in May 2007. In the emails Blythe states "Lisa, I think the check is supposed to go to Drymax, LLC and not to me. It is a temporary way for Hickory to pay a license fee to Drymax, LLC for selling the Drymax socks. I will no longer get a check for the Drymax socks." Lisa Lasecki responded, "Thanks for the clarification. I spoke with Nissan regarding this and he has cleared this mix up I had in my notes." (Blythe Dep. Ex. 106.)

expectations as a minority member. (Pls.' Resp. Br. 11–15.) Blythe characterizes Defendants' overall course of conduct as being in direct conflict with Drymax's interests. (Pls.' Resp. Br. 12.)

{31} Blythe alleges several specific examples. He indicates he learned in 2011 that Rob Bell and HBI were restructuring the Drymax sales force without Blythe's participation, although he was to have control over the sales direction. (Pls.' Resp. Br. 12–13.) Blythe also asserts that HBI usurped opportunities owed to Drymax, by taking secret actions intended to steal the use of the proprietary Drymax Process and to represent to the marketplace that HBI, not Drymax, owns this technology. As an example, Blythe points to the drafting of a 2010 licensing agreement with the company that actually performs the manufacturing using the Drymax Process, attempting secretly to delete Drymax and substitute HBI as the licensed party. (Pls.' Resp. Br. 14; Blythe Aff. ¶ 45, Oct. 14, 2011; Pls.' Resp. Br. Ex. L, K.) Blythe further contends that HBI also has usurped Drymax's sales, has maintained complete control of Drymax's assets, has misappropriated Blythe's ideas for a new soccer sock, and has moved Drymax website hosting to a service under HBI's exclusive control. (Blythe Aff. ¶ 35, Oct. 14, 2011; Pls.' Resp. Br. 15.)

{32} Blythe contends that in the process HBI has starved Drymax of resources necessary for it to grow and achieve the expectations evidenced in the Foundational Documents. Blythe complains that HBI has refused to let Drymax have its own sales force. (Blythe Aff. ¶¶ 22, 28, 34, Oct. 14, 2011; Pls.' Resp. Br. 12.) He also complains that HBI has unnecessarily increased Drymax's debt and has improperly impounded all Drymax revenues in order to make payments on that debt. Blythe contends that Drymax would have been able to grow substantially but for the diverted opportunities and cash flow. (Pls.' Resp. Br. 27.)

{33} Finally, Blythe contends that HBI operates in direct competition with Drymax by currently producing and selling insoles through the 10-Seconds, New Balance, The Athlete's Foot, and Foot Solutions brands, and by producing privately labeled socks. (Blythe Aff. ¶ 38, Oct. 14, 2011; Am. Compl. ¶¶ 107–08, 111.)

### G. Blythe's Conclusion that Defendants Refuse to Honor the Operational Agreement

{34}   The time when Blythe contends that the License and Supply Agreement was to cease being the controlling document for sock sales is imprecise, but it appears he believes that the Operational Agreement should have been implemented for socks sometime during the April 2007 to June 2007 timeframe. (Blythe Dep. Vol. I 217:8– 219:4.)  He also contends that it was some significant time thereafter before he was first able to determine that Defendants instead refused to recognize and implement the Operational Agreement, and, in fact, made representations which led him to believe to the contrary, including their assurances that the agreements would be honored.

{35}   Disputes between Blythe and the other members clearly began before 2007.  Blythe alleges that there were several instances when he was required  to insist that the other Drymax members honor the early agreements.  (Pls.' Resp. Br. 16–17.)  For example, he alleges that the May 6, 2006 Drymax Board meeting minutes acknowledge that the License and Supply Agreement for Active Dry sock sales and royalty payments would end as Drymax sock sales would commence in earnest.  (Pls.' Resp. Br. 17; Rob Bell Dep. Ex. 9.)   Yet, after this meeting Blythe emailed Joseph to ask if arrangements were in place to make the shift to have Drymax undertake the sock sales, to which Joseph responded that "the short answer is not yet but we can get there fast . . ." (Pls.' Resp. Br. Ex. L, Part 1.)  This prompted a January 27, 2007 email from Blythe to Joseph in which Blythe accused that Joseph did not want Drymax to exist at all, and concluded, "Nissan this is turning out to be a big fraud, I need to see a lot (not some) good faith on Hickory's behalf IMMEDIATELY or I will seek legal action to reverse what has taken place." (Pls.' Resp. Br. Ex. L, Part 1; Blythe Dep. Ex. 131.)  Blythe testified that he did not trust Joseph when he first met him and that Joseph has never earned his trust. (Blythe Dep. Vol. III 535:5–536:9.)

{36}    Nevertheless, Blythe contends that Defendants gave him assurances adequate to convince him that the both the Operating Agreement and the Operational Agreement were in force and would be honored.  (Blythe Dep. Vol. I 225:1–2; Pls.' Resp. Br. 15.)  He indicated that there was nothing in the financial records in early 2007 that would have caused him to believe otherwise.  He notes that Drymax sock sales began in the spring of 2007 at the same time when X-Soles sales were declining so that the first sales of the new Drymax socks line would not have been expected to have an immediate large increase in Drymax revenues.  (Blythe Aff. ¶ 32, Oct. 25, 2012.)  Defendants counter that the financial records clearly show that HBI was continuing to treat sales as governed by the royalty agreement and not the Operational Agreement.  Blythe indicates that he did not and should not have been expected at this time to notice Defendants' failure to implement the Operational Agreement.  (Blythe Dep. Vol. I 229:3–233:25.)  Blythe further asserts that when Joseph left HBI, Rob Bell assumed responsibility for Drymax's financials and purposefully disrupted Blythe's receipt of Drymax financial statements from September 2008 through March 2009.  (Pls.' Resp. Br. 19; Blythe Aff. ¶¶ 33–34, Oct. 25, 2012.)  Blythe also stresses that during the 2007– 2008 time frame he was devoted full-time to developing and selling Drymax socks and cannot be expected to have noticed discrepancies between financial statements and his understanding of how Drymax sock sales should have been handled.  He admits that he was provided financial statements whenever he requested them, and when he realized he had not received certain monthly statements, he requested them from Lisa Lasecki who sent them.  (Blythe Aff. ¶¶ 33–34, Oct. 25, 2012.)  He contends it was not until he received these requested financials along with emails from Lisa Lasecki in 2009 that he was able to determine that Defendants were not following the Operational Agreement.  (Blythe Aff. ¶ 37, Oct. 25, 2012.)  Blythe indicated that he then resigned as President of Drymax, but Rob Bell then convinced him to withdraw his resignation through other new false assurances.  (Pls.' Resp. Br. 20; Pls.' Resp. Br. Ex. L, Part 1 HBI_DOC_0687995– HBI_DOC_0687996; Blythe Aff. ¶ 39, Oct. 25, 2012.)

{37}    Defendants deny misleading Blythe. They contend that financial statements Blythe received and for which he is charged with knowledge, clearly and easily indicate that HBI was continuing to make royalty payments rather than implementing the cost of goods agreement Blythe contends HBI was obligated to follow. Defendants contend that Blythe was on notice of his various claims that depend upon his interpretation of the Operational Agreement well before the three years prior to filing suit. Blythe contends that he is entitled to the benefit of a discovery rule and that he should not be reasonably expected to have discovered his claim more than three years prior to filing suit. Further, Blythe contends that Defendants should be estopped from relying on a statute of limitations defense because of their assurances that the Operational Agreement would be followed. (*See* Blythe Aff. ¶ 45, Oct. 25, 2012.)

## H.   The Lawsuit

{38}    Blythe filed suit without first securing any vote of the members. (Blythe's Resp. Defs.' Req. Admis. ¶ 68.) Blythe did not make any demand that Drymax pursue litigation. Initially, Blythe contended that he had authority to retain counsel and bring suit pursuant to authority granted to him by the initial Drymax Operating Agreement he contended had been adopted.

{39}    The Amended Complaint asserts the following causes of action by both Plaintiffs: (1) Usurpation of Control Against Rob Bell, Virginia Bell, HBI, and Joseph; (2) Breach of Director's and Manager's Fiduciary Duties Against Rob Bell, Virginia Bell, and Joseph; (3) Breach of Duties of Loyalty Against HBI, Rob Bell, Virginia Bell, and Joseph; (4) Waste Against HBI, Rob Bell, Virginia Bell, and Joseph; (5) Conversion Against HBI, Rob Bell, Virginia Bell, and Joseph; (6) Fraud and Deceit Against HBI, Rob Bell, Virginia Bell, and Joseph; (7) Unjust Enrichment Against HBI, Rob Bell, Virginia Bell, and Joseph; (8) *Quantum Meruit* Against HBI, Rob Bell, Virginia Bell, and Joseph; (9) *Quantum Valebant* Against HBI, Rob Bell, Virginia Bell, and Joseph; (10) Unfair and Deceptive Trade Practices Against HBI,

Rob Bell, Virginia Bell, and Joseph; (11) Civil Conspiracy Against HBI, Rob Bell, Virginia Bell, and Joseph. The Amended Complaint asserts the following causes of action only by Blythe: (12) Oppression of Meiselman Rights and Expectations Against HBI, Rob Bell, Virginia Bell, and Joseph; (13) Breach of Contract (Breach of the Operating Agreement) Against HBI, Rob Bell, Virginia Bell, and Joseph; (14) Constructive Fraud Against Rob Bell; (15) Breach of Fiduciary Duty to Non-controlling Member Against Rob Bell; and (16) Breach of Fiduciary Duty Against Rob Bell. The Amended Complaint asserts the following causes of action only by Drymax: (17) Breach of Contract (The HBI Operational Agreement) Against HBI; and (18) Breach of Fiduciary Duty Against Rob Bell.

{40} Defendants filed counterclaims: (1) requesting declaratory relief as to the status of the membership interest transfers, management rights, the invalidation of the Operating Agreement, and continued application of the License and Supply Agreement; (2) breach of fiduciary duty against Blythe for having brought the lawsuit without consulting the other members and by forcing the company to incur unnecessary expenses; and (3) a request for judicial dissolution if Blythe's construction of the effect of transfers of membership interests were adopted. They also included an affirmative defense based on the statute of limitations which has a central focus in their motions for summary judgment. The declaratory judgment and dissolution claims in the counterclaim related to the membership interest transfers were resolved by the court's December 10, 2012 Order.

## IV.   ANALYSIS

### A.   Standard of Review

{41} Pursuant to N.C. R. Civ. P. 56(c) ("Rule 56"), a party is entitled to summary judgment if the record shows "that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.

GEN. STAT. § 1A-1, Rule 56(c) (2012).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by proving that an essential element of the opposing party's claim is nonexistent.  *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002).  If the movant successfully makes such a showing, the burden then shifts to the nonmovant to present specific facts establishing the presence of a genuine factual dispute for trial.  *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982).

### B.    Blythe has Standing to Bring a Derivative Action on Behalf of Drymax

{42}    Defendants first contend that Blythe was not authorized to bring a direct action because he did not have such authority by reason of the Drymax Operating Agreement which was never adopted.  Blythe appears to agree that bringing a direct action in Drymax's name would require the approval, consent, agreement, or ratification of a majority of the managers, *see Crouse v. Mineo*, 189 N.C. App. 232, 239, 658 S.E.2d 33, 37–38 (2008) (citing N.C.G.S. § 57C-3-23), and he has abandoned any claim that the Drymax Operating Agreement was adopted as an agreement that now controls.  Accordingly, if Blythe has authority to assert an action for Drymax, he must bring a derivative claim.

{43}    Defendants contend that Blythe cannot sue derivatively because his economic interests diverge from that of Drymax or its other members because of his claim for unreimbursed expenses that lies against Drymax.  They also say he cannot fairly represent Drymax because of his personal grudges with other members of Drymax's Board.  They assert he cannot then fairly and adequately represent the corporation as required under N.C.G.S. § 55-7-41.  (Defs.' Br. in Supp. 31.)

{44}    Blythe disclaims that he is pursuing a claim against Drymax for unreimbursed expenses, and rather any advances he has made in that regard would be addressed later as capital contributions.  He claims that he has met all of the requirements of N.C.G.S. § 57C-8-01 necessary for him to bring a derivative action,

and that North Carolina's LLC Act does not, as Defendants contend, include a requirement that a derivative plaintiff must "[f]airly and adequately represent[ ] the interests of the corporation." A provision to that effect is contained in the Business Corporation Act, *see* N.C.G.S. § 55-7-41, but there is no similar provision in the LLC Act. The LLC Act allows a member to bring a derivative action if:

> (1) [t]he plaintiff does not have the authority to cause the limited liability company to sue in its own right; and (2) [t]he plaintiff (i) is a member of the limited liability company at the time of bringing the action, and (ii) was a member of the limited liability company at the time of the transaction of which the plaintiff complains . . .

N.C.G.S. § 57C-8-01.

{45} The LLC Act does require the complaint to allege with particularity any efforts made by the plaintiff to obtain relief or reasons for failure to make efforts. *Id.* Also, Rule 23(b) of the North Carolina Rules of Civil Procedure requires that a complaint alleging a derivative action be verified. *Peak Coastal Ventures, LLC v. Suntrust Bank*, 2011 NCBC LEXIS 13, at *24 (N.C. Super. Ct. May 5, 2011). The court concludes that Blythe has satisfied requirements necessary to have standing to bring derivative claims. It also concludes that he is not barred from bring such an action by his individual conflict of interest.

## C.   The Court Dismisses Claims Which Have Been Abandoned

{46} Plaintiffs' claim to enforce the Operating Agreement has been abandoned and should be dismissed. Likewise, in light of Blythe's indication that he is not pursuing a claim for reimbursement of advance expenses, any contract claim that can be read to include any such claim should be dismissed or limited in that respect.

**D.** **Neither Party Has An Actionable Claim for Breach of a**
**Fiduciary Duty Owed by One Drymax Member to Another**

{47}    A claim for breach of fiduciary duty claim necessarily requires the existence of a fiduciary relationship. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). In North Carolina, managers of a limited liability company generally owe a fiduciary duty to the company, but not to individual managers or members. *Id.* As a result, a claim for breach of a manager's fiduciary duty is generally properly maintained by the company, not by individual members. *Id.* However, a controlling shareholder may owe a fiduciary duty to minority shareholders. *Id.* "Members of a limited liability company are like shareholders in a corporation in that members do not owe a fiduciary duty to each other or to the company." *Kaplan v. O.K. Techs., LLC*, 196 N.C. App. 469, 473–74, 675 S.E.2d 133, 137 (2009).

{48}    Blythe asserts a claim for breach of fiduciary duty owed by Rob Bell to other members as a controlling member. Defendants assert a counterclaim against Blythe because he has taken steps under a claim of controlling Drymax. Defendants initially argued that Blythe's position should be rejected as inconsistent with his claim that he had achieved effective majority control by reason of the membership interest transfers. (Defs.' Br. in Opp. to Pls.' Mot. for P. Summ. J. (hereinafter Defs.' Opp'n Br.) 21–22.) The court's December 10, 2012 Order determined that no Drymax member has ever had majority control. Blythe also alleged a constructive fraud claim against Rob Bell only, which depends on Rob Bell having a controlling interest or Blythe having ceded dominion and control to him because of a relationship based on trust and confidence. *See Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 28, 560 S.E.2d 817, 823 (2002) (quoting *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)). Blythe rests this claim on his assertion that Bell exercises *de facto* control because he controls HBI and HBI controls Drymax's accounting. (Pls.' Resp. Br. 27–28.)

{49}    The court concludes there is inadequate evidence to conclude that Rob Bell "holds all the cards" in the relationship.  The evidence also demonstrates Blythe's business sophistication, his role as Drymax's manager, and his access to Drymax financial information.  (Defs.' Br. in Supp. 12; Defs.' Br. in Supp. of Their Mot. for Summ. J. as to Claims by William A. B. Blythe (hereinafter Defs.' Br. in Supp. as to Blythe) 24–27.)  Blythe also admits that he holds the power to terminate the use of the Trademarks and admits he never trusted HBI's President Joseph.  (Defs.' Br. in Supp. as to Blythe 24–27.)  While he may have standing to assert violations of fiduciary duty owed to Drymax, he has not demonstrated a basis to claim a fiduciary duty owed to him individually.

{50}    In sum, there is no basis to impose fiduciary duties owed by one Drymax member to another.  Any such claim should be dismissed and breach of fiduciary duty claims should be limited to duties owed to Drymax.

**E.    Unless Time Barred, Claims for the Alleged Breach of the Operational Agreement and Alleged Breaches of Fiduciary Duty Based on the Failure to Honor It Raise Material Issues of Fact**

{51}    While Plaintiffs' evidence may ultimately support breaches of fiduciary duties that do not require the Operational Agreement to be applied as an enforceable agreement governing the sale of socks, many of the asserted breaches of fiduciary duty and mismanagement depend on this initial breach of contract claim, as does much if not all of Blythe's individual *Meiselman* claim.  Initially, Defendants assert then that such claims fail because, as a matter of law, the Operational Agreement does not apply to the sale of socks and, in any event, if applied to the sale of socks, the terms of the Operational Agreement are not sufficiently definite to be enforced.

{52}    As a general proposition, where a party presents adequate facts that an agreement was reached, whether an agreement was actually reached so as to form a binding contract is a question of fact for the jury.  *Story v. Stokes*, 178 N.C. 409, 411, 100 S.E. 689, 690 (1919).  Likewise, where there is evidence of an

agreement having been reached, but there is an ambiguity in the wording the contracting parties used to reflect their agreement, a jury is allowed to consider extraneous evidence to determine the parties' agreement. *See Whirlpool Corp. v. Dailey Constr., Inc.*, 110 N.C. App. 468, 471, 429 S.E.2d 748, 751 (1993).

{53} Having carefully studied the entire record and the substantial arguments presented, the court concludes that the Plaintiffs have presented sufficient evidence to pursue a breach of contract claim based on the Operational Agreement, and assuming the success of that claim, other claims that flow from Defendants' failure to afford Drymax the opportunities flowing from the Operational Agreement, such that such claims should proceed to trial unless they are time barred. While it is true that the Operational Agreement does not on its face specifically mention the sale of socks, and there is evidence suggesting the continuation of the License and Supply Agreement, the Parties promote different constructions of the evidence that present disputed material facts to be resolved by a finder of fact at trial. As discussed more fully below, whether these claims are instead time barred cannot be resolved until other disputed issues are resolved at trial, and particularly the date on which the Operational Agreement can be concluded to have been ready to be implemented but for Defendants' refusal to do so.

{54} The court cannot resolve at this time the extent to which Plaintiffs' other claims depend entirely on enforcing the Operational Agreement. Plaintiffs have presented some claims that arguably are independent of the Operational Agreement. Plaintiffs' various claims include: (1) favoring HBI in ongoing transactions, including refusal to finance Drymax operations to promote products; (2) requiring the proceeds of the royalties to be used to repay the debt to HBI, leaving Drymax unable to pays its debts when they became due; (3) charging an inflated interest rate on the loan to Drymax; (4) transferring assets and opportunities to HBI; (5) causing Drymax to pay expenses for the benefit of HBI and not Drymax; (6) selling Drymax products through Strabell, LLC, of which Rob Bell is controlling owner and officer, at unauthorized and deep discounts thereby

diminishing Drymax's revenues; and (7) by selling HBI products in direct competition with Drymax.

{55} Defendants separately claim that the claims that are not otherwise time barred are also barred by the business judgment rule. (Defs.' Br. in Supp. 25.) This court has applied the business judgment rule to limited liability companies as well as general corporations. *Mooring Capital Fund, LLC v. Comstock N.C., LLC*, 2009 NCBC LEXIS 32, at *30 (N.C. Super. Ct. Nov. 13, 2009). However, protection afforded by the business judgment rule is not unlimited and managers may face liability when they act outside the scope of managing the LLC. *Id.* (citing *Hamby v. Profile Prods., LLC*, 361 N.C. 630, 637 n.1, 652 S.E.2d 231, 236 (2007)). Also, the presumption which the business judgment rule creates "can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction." *Green v. Condra*, 2009 NCBC LEXIS 20, at *95 (N.C. Super. Ct. Aug. 14, 2009) (quoting *Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family L.P.*, 2007 NCBC LEXIS 7, at *22 (N.C. Super. Ct. Mar. 5, 2007)). A plaintiff may overcome the presumption with proof that managers "failed to act (1) in good faith, (2) in the honest belief that the action taken was in the best interest of the company or (3) on an informed basis." *Technik v. WinWholesale Inc.*, 2012 NCBC LEXIS 5, at *32 (N.C. Super. Ct. Jan. 13, 2012).

{56} Plaintiffs forecast evidence, which if accepted, withstand summary adjudication. Summary judgment cannot be granted on the basis of the business judgment rule.

## F. Genuine Issues of Material Fact Remain as to Whether Plaintiffs' Claims are Barred by the Applicable Statute of Limitations

{57} Plaintiffs contend that all of their claims were timely filed. (Pls.' Resp. Br. 50–66.) Defendants contend that all of Plaintiffs' claims are time barred. (Defs.' Br. in Supp. as to Blythe 9.) To resolve these contested positions, the court must first determine what statute of limitations applies, whether the statute has been

tolled, and whether Defendants are estopped from relying on a limitations defense. The court concludes that all claims are governed by the three-year limitations period, and that the contract claims and other claims which rest on a failure to implement the Operational Agreement as a binding contract applicable to the sale of socks accrued at the point at which the Operational Agreement could have been implemented but for Defendants' improper failure to do so. Determining that point in time, however, requires resolving contested issues of material fact. The court concludes, however, that this point in time must be determined and the limitations period then applied because the claims which depend on the Operational Agreement are not governed by the continuing wrong doctrine and the accrual of the cause of action is not governed by a discovery rule. Assuming the statute would otherwise bar claims, the court concludes Plaintiffs' have developed sufficient evidence to support an equitable defense that Defendants are estopped from relying on their limitations defense.

1.    The claims are governed by the three year statute of limitations

{58}    Plaintiffs claim the benefit of either a ten-year statute of limitations based on a claim of constructive fraud or a four-year statute of limitations based on claims for violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"). Plaintiffs' sole constructive fraud claim was pled against Rob Bell individually based on his alleged fiduciary duty owed to other members. The court has rejected that claim. There is then no basis to apply a ten-year statute of limitations.

{59}    The court concludes that Plaintiffs' claims fall outside the scope of the UDTPA. A UDTPA claim requires a showing of "(1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *See*. N.C.G. S. § 75-1.1(a) (2012); *Cabrera v. Hensley*, 2012 NCBC LEXIS 42, at *68 (N.C. Super. Ct. July 16, 2012). A breach of contract alone is not sufficient to state a claim under N.C.G.S. § 75-1.1. *Branch Banking & Trust Co. v. Thompson*, 107 N.C. App. 53, 61,

418 S.E.2d 694, 700 (1992).  Further, matters related to internal corporate governance are not sufficiently in or affecting commerce to form the basis for an UDTPA claim.  *See HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594, 403 S.E.2d 483, 493 (1991); *see also Maurer v. SlickEdit, Inc.*, 2005 NCBC LEXIS 2, at *40 (N.C. Super. Ct. May 15, 2005).

{60}    The court concludes that Plaintiffs' claims are directly related to, and arise out of an asserted breach of contract not supported by the egregious accompanying facts that a breach of contract claim would require to be actionable under the UDTPA, and further the disputes, including the contract claim, relate to matters of internal corporate management.  As such, they do not involve external commerce and do not fall within the UDTPA.

{61}    The court reaches this conclusion mindful of documents Plaintiffs offer to suggest that Defendants unfairly represent outside the corporation that they own or control the Drymax Process when, in fact, they do not.  These documents include, among others, an article from an April 2007 interview with Josh Higgins ("Higgins"), who is now HBI's President, in which Plaintiffs assert that Higgins falsely claims that Drymax socks are HBI's product and that HBI owns the technology.  (Pls.' Br. in Supp. of Supplemental Mot. for Disc. Sanctions (hereinafter "Pls.' Supplemental Br.") Ex. F.)  Plaintiffs also submitted HBI's profile from a website maintained in connection with a 2011 and 2012 Outdoor Retailer tradeshow, in which it was represented that "HBI makes the best performance socks available – Drymax® Socks."  (Pls.' Supplemental Br. 4–5, Ex. H, G.)  Plaintiffs further claim that Defendants considered attempting to surreptitiously have a license diverted to HBI, but no such effort was implemented.  Admittedly, some of these statements may have been in commerce, but they were not statements made or relied upon by Plaintiffs in commerce and they do not transform the internal corporate disputes to disputes governed by the UDTPA.

2. Plaintiffs are not entitled to the benefit of a discovery rule to determine the accrual of their causes of action, but may have an equitable estoppel defense

{62} Plaintiffs contend that their claims for breach of contract, breach of fiduciary duty, and fraud are entitled to the benefit of the discovery rule. Breach of contract claims and breach of fiduciary duty claims that don't rise to the level of constructive fraud are governed by N.C.G.S. § 1-52(1) (2012), which does not contain a discovery provision. *Toomer v. Branch Banking & Trust Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335 (2005); *Kaplan*, 196 N.C. App. at 469, 473–74, 675 S.E.2d at 137. In contrast, the statute of limitations for a claim of fraud is three years but the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake. N.C.G.S. § 1-52(9) (2012). Actual fraud has no all-embracing definition, but Plaintiffs must establish: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007) (quoting *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974)). The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion. *Forbis*, 361 N.C. at 527, 649 S.E.2d at 387.

{63} Plaintiffs' fraud claim is based on their assertion that Defendants misrepresented that all of the agreements were in force and that the Parties were going to make Drymax a company that would stand on its own, and in doing this Blythe relied on their acts and representations and Defendants diverted asserts from Drymax for the benefit of HBI. (Pls.' Resp. Br. 54–58.) The court concludes that the evidence does not adequately support a claim of fraud or fraudulent concealment. The contested facts rather play out as contrasting positions on (1) when the Operational Agreement was ready to be but was not implemented; and (2) whether Defendants thereafter induced Blythe not to pursue his claim so that they should be estopped from presenting a limitations defense.

{64} The limitations issue is unusual because Plaintiff's claim that agreements reached in 2003 and 2004 regarding the future sale of Drymax branded socks were not to be or were not capable of being implemented until a future point when Drymax was ready to launch and accept responsibility for the sale and marketing of such socks. Defendants less charitably argue that Plaintiffs' claim is that an agreement related to socks first "sprang into existence" at some point in 2007. The point at which Plaintiffs claim that the Operational Agreement could and should have been implemented is not easily fixed as a point in time, but it was a definite point and is the date from which the statute of limitations should be measured. Defendants claim that date was necessarily no later than mid 2007. (Defs.' Br. in Supp. 14–15.) However, Plaintiffs dispute this factual assertion. Plaintiffs also argue that Defendants controlled all the information necessary to uncover the breach of contract due to their positions on both sides of the agreement. (Pls.' Resp. Br. 66.) Under the facts, the court believes this disputed evidence plays out as to whether Plaintiffs have an equitable estoppel defense to any statute of limitations defense rather than providing Plaintiffs the benefit of a discovery rule that would protect against the cause of action having accrued while Blythe awaited a final determination of whether Defendants would honor the Operational Agreement.

{65} The doctrine of equitable estoppel may bar a litigant from relying upon the statute of limitations. *Duke Univ. v. Stainback*, 320 N.C. 337, 357 S.E.2d 690 (1987). "Equitable estoppel arises when an individual by his acts, representations, admissions or silence, when he has a duty to speak, intentionally or through culpable negligence, induces another to believe that certain facts exist and that other person rightfully relies on those facts to his detriment." *Miller v. Talton*, 112 N.C. App. 484, 488, 435 S.E.2d 793, 797 (1993). The court need not find bad faith, fraud nor intent to deceive to apply the doctrine of equitable estoppel. *Id.* The essential elements of estoppel include: (1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3)

the estopped party's knowledge, actual or constructive, or the real facts. The party asserting estoppel must have: (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice. *Friedland v. Gales*, 131 N.C. App. 802, 807, 509 S.E.2d 793, 796–97 (1998). Applying estoppel depends on the facts of each case, and the conduct of both parties must be weighed in balancing equity. *Miller*, 112 N.C. App. at 488, 435 S.E.2d at 797. If the facts raise a permissible inference that the elements are present, but other inferences may be drawn from contrary evidence, the issue of estoppel is for the finder of fact. *Id.; see also Friedland*, 131 N.C. App. at 809, 509 S.E.2d at 798.

{66} The court concludes that there are disputed facts as to whether Blythe was adequately mislead after being on notice of his potential claims so as to be entitled to the benefit of equitable estoppel. However, he is not entitled to the benefit of the discovery rule which is applied to claims based on fraud.

3. Plaintiffs' claims based on the Operational Agreement are not governed by the continuing wrong doctrine

{67} The general rule is that a cause of action accrues as soon as the right to institute and maintain a suit arises, and the limitations period begins to run when the cause of action accrues. *Williams v. Blue Cross Blue Shield of N.C.*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003). In certain circumstances, the limitations period may be tolled by application of the "continuing wrong" doctrine. *Id.* "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Id.* (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)). When the doctrine applies, the statute of limitations does not begin to run until the violative act ceases. *Id.* To determine whether the doctrine applies, the court must consider "the particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Williams*, 357 N.C. at 179, 581 S.E.2d at 423 (quoting *Cooper v. United States*, 442 F.2d 908, 912 (7th Cir. 1971)).

{68}    Plaintiffs claim that Defendants' continued refusal to recognize the contract between HBI and Drymax leads to the conclusion that every day is a new day in the relationship and a continuing abuse of that relationship adequate to apply the continuing wrong doctrine to their claims. (Pls.' Resp. Br. 62.) Defendants instead contend that there is a single point in time when either a breach of contract occurred or it did not and that the dispute matured at that fixed point in time, so that Plaintiffs' claims are only the continuing effects of the initial breach. (Defs.' Reply in Supp. of Mot. for Summ. J. (hereinafter Defs.' Reply) 18.)

{69}    The court has carefully studied the cases upon which Plaintiffs rely to invoke the continuing wrong theory. In *Marzec v. Nye*, the North Carolina Court of Appeals applied the continuing wrong doctrine to certain of plaintiff's breach of fiduciary duty claims but not others. 203 N.C. App. 88, 97, 690 S.E.2d 537, 544 (2010). There the plaintiff alleged that the defendant breached his fiduciary duties by ceasing to make monthly salary payments to plaintiff and refusing to pay back pay, refusing to comply with his request for accounting, failing to produce corporate records, taking out a personal loan in the company's name and making payments with company funds, and usurping a corporate opportunity. *Id.* at 94, 690 S.E.2d at 542. The court applied the continuing wrong doctrine to the failure to pay Marzec's salary or to provide him an accounting, but the court did not apply the doctrine to save the claims based on the failure to produce corporate records, because this latter claim was a continued ill effect from the single original failure to produce the records. *Id.* at 95, 690 S.E.2d at 543.

{70}    In *Babb v. Graham*, the Court of Appeals applied the doctrine to plaintiff's claim for breach of fiduciary duty that alleged the trustee refused to make required distributions under a trust. 190 N.C. App. 463, 660 S.E.2d 626 (2008). In an out of state case, *Butler v. Gibbons*, the court held that a new cause of action accrued each time the defendant failed to account and turn over proceeds earned from renting properties. 173 App. Div. 2d 352, 569 N.Y.S.2d 722 (1st Dept. 1991).

{71}    The court believes the facts of this case more closely approximate those of *Stratton v. Royal Bank of Can.*, where the continuing wrong doctrine was not

applied. ____ N.C. App. ____, 712 S.E.2d 221 (2011). There, the plaintiff inherited stock certificates in Bank of Manteo that had merged in 1962 with Planter's Bank and later in 1990 with Centura Bank, a subsidiary of Royal Bank of Canada. The surviving bank did not recognize the shares after the first merger. Plaintiff brought a claim for conversion and unjust enrichment. *Id.* at 224–25. The Court distinguished *Marzec* and *Babb* and held that the conversion of the stock was a discrete occurrence, and plaintiff's loss of shareholder rights and dividends were the continual ill effects from the single initial conversion. The court noted there was not a clear cut wrong precipitating the subsequent injuries to the plaintiffs in *Marzec* and *Babb*. *Id.* at 229. The court further held that applying the continuing wrong doctrine to the facts presented there would contravene the underlying purposes of the statute of limitations by discouraging shareholders from promptly investigating and litigating stock conversion claims. *Id.* at 229–30.

{72}  The court here again concludes that there was a single initial refusal by other members to honor the Operational Agreement in the manner that Blythe champions. Although defining the precise date this breach occurred may require resolution of disputed facts, a jury can affix the breach at a discrete point in time, just as the conversion in *Stratton* occurred at a fixed point. As a result, the court concludes that a claim for breach of the Operational Agreement and any claims, including any breach of fiduciary duty claims, that depend upon such breach are not governed by the continuing wrong doctrine.

{73}  It is possible that some of the fiduciary duty breaches which do not necessarily depend on enforcing the Operational Agreement might be ones to which the continuing wrong doctrine would apply under *Marzec.* Some of them may not be subject to a three year statute of limitations in the first instance. But those that rest on the Operational Agreement are actionable, if at all, only if either they were brought within three years of the date the jury determines the Operational Agreement was first ready to be implemented but for Defendants' wrongful acts, or if Defendants are estopped from asserting a limitations defense. Defendant's limitations defenses must await trial.

# V. CONCLUSION

{74} For the reasons noted above, the court holds that:

(1) Certain claims in Plaintiffs' Motion for Partial Summary Judgment and Defendants' two Motions for Summary Judgment related to the effect of membership interest transfers were resolved by the court's earlier December 10, 2012 Order;

(2) The remaining issue in Plaintiffs' Motion for Summary Judgment relates to the counterclaim presented against Blythe individually for breach of his fiduciary duty to other members. The Plaintiffs' Motion for Partial Summary Judgment on that claim is GRANTED and that count of the counterclaim is DISMISSED;

(3) Plaintiffs' claims for breach of the Drymax Operating Agreement are DISMISSED;

(4) The Amended Complaint may be not read to assert a claim by Blythe for reimbursement of advanced expenses and no such issue may be submitted to a jury;

(5) All claims asserted by reason of an individual fiduciary duty owed by one Drymax member to another Drymax member is DISMISSED;

(6) Plaintiffs' claims based on the UDTPA are DISMISSED;

(7) In all other respects, Defendants' Motion for Summary Judgment as to Blythe's claims and Defendants' Motion for Summary Judgment as to Drymax's Claims are DENIED, subject to further consideration of a limitations defense based on the fact finder's determination of when certain causes of action first accrued.

IT IS SO ORDERED, this 4th day of February, 2013.