Jekson USA, Inc. v. White, 2026 NCBC 18.

STATE OF NORTH CAROLINA

FRANKLIN COUNTY

JEKSON USA, INC.,

          Plaintiff,

v.

JAMES EDWARD WHITE,

          Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV001391-340

**ORDER AND OPINION ON
DEFENDANT'S MOTION TO DISMISS**

**THIS MATTER** is before the Court on Defendant James Edward White's Motion to Dismiss Pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Motion to Dismiss" or "Motion," ECF No. 22). Having considered the Motion to Dismiss, the parties' briefs, the arguments of counsel, the applicable law, and all other appropriate matters of record, the Court concludes that the Motion to Dismiss should be **DENIED** for the reasons set forth below.

*Nelson Mullins Riley & Scarborough, LLP, by Matthew Joseph Gorga, Nathaniel Pencook, and Phillip J. Strach, for Plaintiff.*

*Ayers & Haidt, P.A., by Jack Ayers and James M. Ayers, for Defendant.*

Davis, Judge.

## INTRODUCTION

1. This case requires the Court to once again consider claims by an employer alleging that its former employee misappropriated its trade secrets to start a new competing business venture. In the present Motion, the former employee seeks dismissal of all claims asserted by the employer against him.

## FACTUAL AND PROCEDURAL BACKGROUND

2. The Court does not make findings of fact on a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the complaint (and in documents attached to the complaint or referred to in the complaint) that are relevant to the Court's determination of the motion. *See Concrete Serv. Corp. v. Inv'rs Grp., Inc.*, 79 N.C. App. 678, 681 (1986); *Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at *11 (N.C. Super. Ct. July 12, 2017).

3. Plaintiff Jekson USA, Inc. ("Jekson"), a New Jersey corporation, is headquartered in Youngsville, North Carolina. (Compl. ¶ 3, ECF No. 3.) Jekson operates in the "vision inspection and track and trace" industry. (Compl. ¶ 8.) It has a history of working with customers in regulated fields such as the pharmaceutical and biopharma industries, and provides those customers with "proprietary automated systems, custom equipment and other proprietary solutions for inspecting products, tracking them through the supply chain, and moving them efficiently during manufacturing." (Compl. ¶¶ 9, 11.)

4. Defendant James Edward White is a North Carolina citizen who lives in Youngsville, North Carolina. White began employment for Jekson in 2020 as the Director of Mechanical Engineering and Plant Manager for its facility in Youngsville. (Compl. ¶¶ 4, 13.) White "oversaw the design and development of custom automation systems, managed engineering and production teams, and participated in the

creation of proprietary technologies for product inspection, material handling, and packaging." (Compl. ¶ 14.)

5.      In early 2020, White executed a document titled "Jekson USA Employment Agreement" (the "Employment Agreement," Compl., Ex. A).

6.      In August 2024, White and another Jekson employee developed the "mechanical design, feeding assembly, and performance specifications" for a proprietary ammunition tray loading and inspection system. (Compl. ¶ 30.) The system was designed to "automatically orient and load 9mm rounds tip-down into 5x10 (50 count) plastic trays, inspect each round for primer defects using a vision system, and reject trays with defective rounds—all while achieving a high throughput rate." (Compl. ¶ 29.)

7.      On 20 September 2024, White took a physical rendering of the tray loading design from Jekson's facility to a 3D scanning vendor so that he could copy the design. (Compl. ¶¶ 46, 49.)

8.      White resigned from Jekson the following day. (Compl. ¶ 50.)

9.      On 23 September 2024, White formed a limited liability company, Innovative Design Systems, LLC ("IDS"), which is also headquartered in Youngsville. (Compl. ¶ 53.)

10.     Jekson's Complaint alleges that White violated his Employment Agreement by failing (after his resignation) to return "all of Jekson's confidential, proprietary, and trade secret information[,]" including designs and information related to the tray loading design. (Compl. ¶ 56.)

11.     Jekson asserts that IDS is a direct competitor to Jekson, as its business focuses on "tray loading, sorting, counting, and inspection systems in the ammunition and pharmaceutical industries." (Compl. ¶ 55.) Furthermore, Jekson alleges, IDS's website

> publicly promotes its capabilities which are demonstrably derived from and only made possible through the unauthorized use of Jekson's confidential information and trade secrets—including Jekson's tray loading, sorting, counting, and inspection system. . . .[T]he website broadcasts that IDS provides its "Inspection System", "Sort & Count", and "Tray Loading" systems, including what it calls its "IDS TR2U Feed System."

(Compl. ¶ 61.)

12.     Jekson contends that White stole its "IP, including its tray loading, sorter, counter, and inspection system, and is now using that information to compete with Jekson, including through his company IDS." (Compl. ¶ 63.)

13.     Jekson further asserts that White is inappropriately using other confidential, proprietary, and trade secret information, including "customer and supplier information, pricing, pipeline, and opportunity lists[.]" (Compl. ¶ 64.)

14.     Jekson alleges that White "wiped all of the information off of his company-issued laptop before returning it in attempt [sic] to conceal his efforts to misappropriate Jekson's confidential information and trade secrets." (Compl. ¶ 58.)

15.     In addition, Jekson contends that since forming IDS, White has solicited Jekson's customers and has hired a former Jekson employee, Dell Ficklin, to work at IDS. (Compl. ¶¶ 65, 67–68.)

16. On 21 July 2025, Jekson initiated this action by filing its Complaint (ECF No. 3) in Franklin County Superior Court. The Complaint asserts claims for (1) breach of contract; (2) violations of the North Carolina Trade Secrets Protection Act; (3) unfair and deceptive trade practices ("UDTP"); and (4) conversion.

17. This case was designated as a mandatory complex business case on 22 July 2025 and assigned to the undersigned. (ECF Nos. 1–2.)

18. On 8 September 2025, White filed the present Motion to Dismiss.

19. The Court held a hearing on the Motion on 13 November 2025 at which both parties were represented by counsel.

20. The Motion has been fully briefed and is now ripe for resolution.

## LEGAL STANDARD

21. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017). The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]" *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987). The Court accepts all well-pled factual allegations in the relevant pleading as true. *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018). The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't Health and Hum. Servs., Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (cleaned up).

22.     Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint." *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (cleaned up).  The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (cleaned up).  Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (cleaned up).

23.     Our Supreme Court has held that "dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

24.     In his Motion to Dismiss, White seeks dismissal of all claims set forth in the Complaint.  The Court will address White's arguments in turn in conjunction with each of the four claims.

### I.     Breach of Contract

25.     "The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.  The elements of a valid contract

are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (cleaned up).

26. The provisions of White's Employment Agreement implicated by his arguments in support of the Motion to Dismiss state as follows:

> **1. Position and Duties.** During the time this Agreement is in effect, the Company will employ the Employee and the Employee will accept such employment, in such capacities and with such powers and duties as may from time to time be determined by the President of the Company. The Employee will devote substantially all of his time and attention to being the Director Mechanical Engineering/ Plant Manager reporting to the President, and will use his best energies and abilities in the performance of, his duties and responsibilities as prescribed in this Paragraph 1, and will not engage as a director, officer, employee, partner, shareholder, or any other capacity, in any business which competes, conflicts or interferes with the performance of his duties hereunder in any way, or solicit, canvass or accept any business or transaction for any other such competing business.

> **2. Compensation and Incentives.**

> A. For all services to be rendered by the Employee pursuant to Paragraph 1 of this Agreement, and in part of the consideration for the other obligations and promises of the Employee as set forth in this Agreement, the Company will compensate the Employee at the annual rate of $150,000 ("Base Compensation") with it being intended that such Base Compensation shall be reviewed annually hereafter, with the changes in Base Compensation to be determined by the President in his sole discretion from time to time based on the performance of the Employee and the results of the Company. The Base Compensation shall be paid to the Employee in equal installments and shall be subject to applicable income tax withholding deductions required by law and other deductions authorized by the Employee. The Employee will be entitled to four (4) weeks of vacation, eight (8) Holidays and sick leave in accordance with Company policy, car allowance of $400 per month, car maintenance of $1,200 per year and family coverage under health plan.

> B. In addition to his Base Compensation, the Employee will be entitled to the following performance incentives during the time he is employed by the Company:

i)      A quarterly bonus program not to exceed $5,000 per quarter based on mutually agreed upon milestones. The bonus will be paid after completion of tasks, at the end of each quarter.

**3. Term**. This Agreement for employment by and between the parties shall be an agreement for employment at-will commencing on the date hereof and extend to 3 years duration based on performance metrics agreed to between the parties as stated in Annex-1. Employee shall be employed at-will, which means the Employee and or the Company may terminate this Agreement at any time with or without notice to the other party.

**4. Non-Competition**. During the time of his employment by the Company, and for a period of One (1) year thereafter the Employee's termination [sic] for any reason, the Employee shall not, directly or indirectly, acting alone or in conjunction with others:

A.      Request any existing customers who was [sic] first introduced to Employee by Company, with whom Employee has worked in the twelve (12) months prior to the Employee's termination, at time [sic] of employment, of any business then being conducted by the Company to curtail or cancel their business with the Company;

B.      Contact or hold any business relationship (other than in [sic] course of business cooperation between the Company and Employee) with an existing client who was first introduced to Employee by Company, of the Company with which Employee had contact or about which access to Confidential Information during the twelve (12) months of [sic] prior to Employee's termination.

C.      Induce, or attempt to influence, any employee of the Company to terminate employment with the Company or otherwise interfere with the relationship between the Company and its employees.

D.      Act or conduct himself in any manner which is contrary to the best interests of the Company.

The Employee recognizes that immediate and irreparable damage will result to the Company if the Employee breaches any of the terms and conditions of this Paragraph 4 and, accordingly, the Employee hereby consents to the entry by any court of competent jurisdiction of an injunction against him to restrain any such breach, in addition to any other remedies or claims for money or damages which the Company may seek with the Company having to show immediate irreparable harm or

the posting of a bond. The Employee represents and warrants to the Company his experience and capabilities are such that he can obtain employment in business without breaching the terms and conditions of this Paragraph 4, and that his obligations under the provisions of this Paragraph 4 (and the enforcement thereof by injunction or otherwise) will not prevent him from earning a livelihood. The Employee agrees to pay any and all reasonable attorney fees sustained by the Company in connection with any breach of this Agreement.

**5. Trade Secrets/Confidential Information**. The Employee agrees that, except to perform Employee's duties for the Company, he will not at any time or in any manner divulge, disclose or communicate to any person, firm or corporation any trade, technical or technological secrets; any details of the Company's organization or business affairs, its manner of operation, its plans, processes, and/or other data; any names of past or present customers of the Company; or any other information relating to the business of the Company (referred to as "Confidential Information"), without regard to whether all of the foregoing matters will be deemed confidential, material, or important. With respect to the foregoing, the Employee hereby stipulates and agrees that the same are confidential, material, and important, and any breach of this Paragraph 5 will adversely affect the business of the Company, its effective and successful management, and its inherent good will.

**6. Return of Company Documents.** Employee agrees that, upon any termination of his/her employment with the Company immediately or upon the Company's demand, he/she will return all Confidential Information in his/her possession, directly or indirectly, that is in written or other tangible form (together with all duplicates thereof) and that he/she will not retain or furnish any such Confidential Information to any third party, either by sample, facsimile, film, audio or video cassette, electronic data, verbal communication or any other means of communication.

(Employment Agreement, §§ 1–6.)

27.     White makes four arguments in support of his Motion to Dismiss Jekson's breach of contract claim.

28.     First, he contends that the non-competition provision in Section 4 (the "Non-Compete") is unenforceable due to lack of consideration on the theory that the

Employment Agreement was executed fourteen days *after* he began working for Jekson.

29.  White points to two sections in the Employment Agreement as the basis for this assertion.  First, the language at the end of the Employment Agreement in the section immediately above the signature block reads:

> IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written above [sic] for employment *which started on January 27, 2020.*

(Employment Agreement, at 2. (emphasis added).)

30.  However, the first paragraph of the Employment Agreement states:

> THIS EMPLOYMENT AGREEMENT (the "Agreement") made and entered into *on February 10, 2020,* by and between Jim White (the "Employee"), an individual residing at 212 Woodcrest Dr., Youngsville, North Carolina 27596 and Jekson USA, Inc., a New Jersey corporation having offices at 41 Bryce Road, Berlin, NJ 08009.

(Employment Agreement, at 1. (emphasis added).)

31.  White argues that because his employment with Jekson began on 27 January 2020, the provision of new consideration was required to make the 10 February 2020 Employment Agreement a legally effective contract.

32.  It is true that new consideration is necessary to make a non-competition agreement enforceable when it is signed after employment has begun.  *See Clifford v. River Bend Plantation, Inc.*, 312 N.C. 460, 466 (1984) ("[A]n agreement to modify the terms of a contract must be based on new consideration."); s*ee also Elior, Inc. v. Thomas*, 2024 NCBC LEXIS 61, at *49 (N.C. Super. Ct. Apr. 22, 2024).

33.     However, our courts have held that no new consideration is required where the parties agreed to the non-competition restriction at the time the employment relationship started, even though the agreement was not reduced to writing until later. *Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at *15 (N.C. Super. Ct. Oct. 19, 2007) ("It is immaterial that the written contract is executed after the employee starts to work, so long as the terms incorporated therein were agreed upon at the time of employment.").

34.     The Employment Agreement contains consideration flowing from Jekson to White in Section 2, and it is unclear based on the present limited record whether the compensation terms contained therein were fully agreed to by the parties at the time White first began work.

35.     In its response brief (ECF No. 29), Jekson contends that the parties agreed to the Non-Compete at the time White's employment first began—even though it was not reduced to writing until two weeks later. Although Jekson will be required to prove this assertion through admissible evidence at a later stage of this litigation, it would be premature to dismiss this claim at the pleadings stage without giving Jekson the opportunity to do so. *See Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at *9 (N.C. Super. Ct. June 9, 2017) ("To prevail on its claim, [plaintiff] will need to demonstrate that the Confidentiality Agreements memorialize an agreement made at the time of the new employment relationship, but it does not need to prove its case at this stage.").[1]

---

[1] White also makes an argument that the compensation provisions in Section 2 are illusory because of the language contained therein purporting to give Jekson unilateral discretion to

36.     Furthermore, although White also makes the same "no new consideration" argument with regard to the Confidentiality Provision of the Employment Agreement, this Court has held that "a confidentiality agreement need not be supported by additional consideration if the agreement does not constitute a restraint of trade." *See Amerigas Propane, L.P. v. Coffey*, 2015 NCBC LEXIS 98, at *38 (N.C. Super. Ct. Oct. 15, 2015).[2]

37.     Second, White argues that the Non-Compete has expired because Section 3 of the Employment Agreement only provided for a three-year term of employment, meaning that the Non-Compete ended once White had worked for Jekson for those three years.

38.     Section 3 appears to be ambiguous as it contains, on the one hand, language suggesting a three-year term of employment, and, on the other hand, language stating that the employment is merely at-will.

39.     In any event, it is undisputed that White remained a Jekson employee for over four and a half years—from January 2020 through September 2024. Therefore, even assuming *arguendo* that his employment was originally intended to last for three years, his status as an employee would have lapsed into an at-will arrangement after the three years ended.

---

make prospective adjustments to White's compensation. However, at least one plausible interpretation of this provision is that White was to be initially paid a base compensation amount of $150,000 per year, with possible annual adjustments to that amount going forward. In any event, the Court cannot say at this early stage of the case that this language renders the entire agreement illusory.

[2] At the present juncture, there is no basis for the Court to find that the Confidentiality Provision in the Employment Agreement functions as a restraint on trade.

40.     Moreover, there is no language in the Employment Agreement stating that the Non-Compete would expire at the end of three years. To the contrary, Section 4 prefaces the Non-Compete terms with the phrase "[d]uring the time of his employment by the Company, and for a period of One (1) year thereafter, the Employee's termination[.]" Thus, the Non-Compete would presumably have remained in effect for a year after White's resignation on 21 September 2024.[3]

41.     Third, White asserts that the Non-Compete would only have been triggered if his employment had ended via termination by Jekson rather than by his resignation. This argument is grounded on White's reading of the prefatory language in Section 4 of the Employment Agreement, which states in pertinent part: "During the time of his employment by the Company, and for a period of One (1) year thereafter the Employee's *termination for any reason*[.]" (emphasis added). White takes the position that because he voluntarily *resigned* his position with Jekson and was not *terminated* by the Company, the noncompetition restrictions set out in Section 4 were not triggered.

42.     However, our Court of Appeals has twice addressed this same argument based on similar language in employment agreements and each time has held that any such ambiguity could not be resolved at the pleadings stage. *See Battleground*

---

[3] To the extent that White is similarly claiming that the Confidentiality Provision expired upon the end of the three-year period, no expiration date is contained in that section of the Employment Agreement, and as a result the confidentiality terms remained in effect following his resignation. *See NFH, Inc. v. Troutman*, 2019 NCBC LEXIS 66, at *42 (N.C. Super. Ct. Oct. 29, 2019) (holding that a confidentiality provision in an employment agreement extended after former employee's resignation where confidentiality provision contained no expiration date).

*Veterinary Hosp., P.C.,* 2007 NCBC LEXIS 33, at \*136 (finding contract language regarding "termination of employment" ambiguous and that its interpretation was properly a question of fact for a jury); *Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 476 (2000) ("From the language alone, we cannot say that, as a matter of law, the covenant against competition was triggered when defendant resigned from his employment.").

43. Fourth, White argues that the Complaint fails to allege how he actually breached the Employment Agreement.

44. The Court finds Jekson's allegations on this issue to be sufficient to survive the Motion to Dismiss. For example, Jekson alleges that White hired Dell Ficklin, a former Jekson technician, to work for him at his new venture, IDS, in violation of the restrictions on solicitation contained in Section 4 of the Employment Agreement. (Compl. ¶¶ 47, 54.) Moreover, Jekson also asserts that White has solicited a number of Jekson's customers, as well as some of its suppliers. (Compl. ¶ 65.) Additionally, Jekson alleges that White has used its confidential information, including "customer and supplier information, pricing, and opportunity lists." (Compl. ¶ 64.) Finally, the Complaint specifically states that White is using Jekson's "IP, including its tray loading, sorter, counter, and inspection system, and is now using that information to compete with Jekson, including through his company IDS." (Compl. ¶ 63.)

45. Therefore, White's Motion to Dismiss Jekson's breach of contract claim is **DENIED**.

## II.    Misappropriation of Trade Secrets

46.    North Carolina's Trade Secrets Protection Act ("NCTSPA") provides that "[t]he owner of a trade secret shall have [a] remedy by civil action for misappropriation of his trade secret." N.C.G.S. § 66-153.

47.    The NCTSPA defines a "trade secret" as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

    a.    Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

    b.    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

48.    The NCTSPA defines "misappropriation" as the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C.G.S. § 66-152(1).

49.    White argues that the Complaint fails to allege with the requisite specificity the trade secrets at issue.

50.    However, Jekson has alleged that it "owns a proprietary tray loading, sorting, counting, and inspection system, which constitutes a trade secret under the NCTSPA." (Compl. ¶ 84.) That system is more specifically described as one "designed

to automatically orient and load 9mm rounds tip-down into 5x10 (50 count) plastic trays, inspect each round for primer defects using a vision system, and reject trays with defective rounds—all while achieving a high throughput rate." (Compl. ¶ 29.)

51.     Jekson alleges that this design constitutes a trade secret and is a "novel solution tailored to the ammunition industry (with applicability to the pharmaceutical industry) and is a key part of Jekson's competitive advantage." (Compl. ¶ 30.)

52.     Jekson contends that it made efforts to protect information about its tray loading design (and its other trade secrets) by limiting access within the company to a need-to-know basis, housing proprietary information on its secure document management platform, and avoiding public dissemination of proprietary information—requiring employees to sign non-disclosure agreements and providing employees with laptop computers and cell phones which are password protected. (Compl. ¶¶ 32, 36.)

53.     Jekson further describes other information claimed to be trade secrets in support of this claim, including

a. Jekson's IP and information relating to the development, design, performance, and operation of Jekson's proprietary systems, processes, technology, and custom-designed equipment;

b. Information relating to Jekson's actual and prospective customers, including customer lists and opportunity lists;

c. Jekson's pricing information and strategies; and

d. Business plans, strategies, projections, and opportunities.

(Compl. ¶ 85.)

54. Although Jekson's allegations regarding its other alleged trade secrets are somewhat lacking in specificity, its detailed assertions regarding the ammunition tray are sufficient to satisfy this element of a claim for misappropriation of a trade secret.

55. White also asserts that the Complaint fails to adequately allege acts of misappropriation.

56. But Jekson's Complaint alleges that White (1) voiced his contention "that Jekson's IP, including its proprietary designs, are actually *his* designs" (Compl. ¶ 38); (2) "stall[ed] business opportunities that had arisen from this new system, and . . . even began advocating for Jekson to get out of the ammunition industry altogether" (Compl. ¶ 41); (3) "began instructing Yereance (Jekson's Project and Product Manager) to ignore ammunition client calls and emails, and stated that he did not want to participate in future calls or meetings with ammunition clients" (Compl. ¶ 42); (4) "was simultaneously seeking Jekson's confidential information regarding the ammunition industry, including Jekson's pipeline and opportunity lists, and customer information to use for himself . . . fervently request[ing] this information from Yereance on multiple occasions in August and September 2024" (Compl. ¶ 43); (5) took a physical rendering of Jekson's proprietary tray loading system from the Jekson facility to a 3D scanning vendor and resigned the following day (Compl. ¶¶ 46, 50); and (6) while still employed by Jekson, formed a new company that directly competes against Jekson by focusing on the tray loading, counting, and

inspection systems for the ammunition and pharmaceutical industries (Compl. ¶¶ 53, 55).

57.     These allegations are easily sufficient to satisfy the misappropriation element of Jekson's claim under the NCTSPA. *See Strata Solar, LLC v. Naftel*, 2020 NCBC LEXIS 129, at *34 (N.C. Super. Ct. Oct. 29, 2020) (finding misappropriation sufficiently pled where plaintiff alleged that defendants acquired trade secrets without authorization and used them in competition with plaintiff); *Wells Fargo Ins. Servs. USA v. Link*, 2018 NCBC LEXIS 42, at *40–42 (N.C. Super. Ct. May 8, 2018) (holding that plaintiff had sufficiently pled a misappropriation claim where it made allegations that defendant had access to plaintiff's trade secrets through his employment and used those secrets to solicit plaintiff's customers for the benefit of a competitor).

58.     Therefore, White's Motion to Dismiss is **DENIED** as to the misappropriation of trade secrets claim.

### III.     Conversion

59.     Our Supreme Court has held that "[t]here are, in effect, two essential elements of a conversion claim: ownership in the plaintiff and wrongful possession or conversion by the defendant." *Variety Wholesalers, Inc. v. Sale Logistics Traffic Servs., LLC*, 365 N.C. 520, 523 (2012) (cleaned up). "In cases where the defendant comes into possession of the plaintiff's property lawfully, the plaintiff must show that it made a demand for the return of the property that was refused by the defendant."

*Morris Int'l v. Packer*, 2021 NCBC LEXIS 99, at *75 (N.C. Super. Ct. Nov. 2, 2021) (cleaned up).

60. White contends that this claim fails because the Complaint does not allege that he refused a demand from Jekson that he return its property. However, under North Carolina law, this additional requirement is necessary only when the defendant *lawfully* came into possession of the converted items. *See Lockerman v. S. River Elec. Membership Corp.*, 250 N.C. App. 631, 641 (2016) ("[W]here a person or entity has *lawfully* obtained possession, the true owner must demand return of the goods and receive an absolute refusal to surrender them.") (emphasis added); *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 83 (2011) ("[W]hen the defendant *lawfully* obtains possession or control and then exercises unauthorized dominion or control over the property, demand and refusal become necessary elements of the tort.").

61. Here, Jekson has alleged that White took a prototype of its ammunition tray without permission and failed to return it. (Compl. ¶¶ 46, 49, 63, 89.) Thus, Jekson was not required to plead demand and refusal and, as a result, has adequately pled a claim for conversion. Therefore, the Motion to Dismiss with regard to this claim is **DENIED**.

## IV. UDTP

62. To establish a prima facie claim for UDTP, a plaintiff must show: "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Gen. Fid. Ins. v. WFT, Inc.*, 269 N.C. App. 181, 191 (2020) (cleaned up).

63. Although White argues that Jekson has failed to plead a valid claim for UDTP, the Court has allowed Jekson's claims for misappropriation of trade secrets and conversion to go forward. Under North Carolina case law, these claims are sufficient to serve as predicates for a UDTP claim. *See Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at *51 (N.C. Super. Ct. June 18, 2021) ("Our Courts have long recognized that claims for misappropriation of trade secrets . . . may form the basis of a UDTPA claim." (cleaned up)); *Bartlett Milling Co. v. Walnut Grove Auction & Realty Co.*, 192 N.C. App. 74, 83 (2008) ("[A]cts of 'conversion' may constitute unfair and deceptive trade practices[.]").

**64.** Thus, the Motion to Dismiss the UDTP claim is **DENIED**.

## CONCLUSION

65. Therefore, for the reasons set out above, White's Motion to Dismiss is **DENIED**.

**SO ORDERED**, this the 4th day of March 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge
for Complex Business Cases